In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

Nos. 14-3747 and 14-3772

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEVEN MANDELL,

*Defendant-Appellant.*

———————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 12 CR 842-1 — **Amy J. St. Eve**, *Judge.*

———————————

ARGUED APRIL 1, 2016 — DECIDED AUGUST 17, 2016

———————————

Before POSNER, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Steven Mandell was convicted for conspiring to kidnap, and for conspiring and attempting to extort, a wealthy businessman. His plan involved a gun, and so he was also convicted for possessing a gun in furtherance of a crime of violence, and for possessing a gun as a convicted

felon. The evidence included videos from hidden cameras that the FBI installed at the site of the planned extortion. As required by statute, a federal court authorized the installation of the cameras. Arguing that the court only did so because the FBI's application was misleading due to certain omissions, Mandell moved to suppress the video evidence. The district judge denied that motion and we affirm because the omissions Mandell complains about are not material.

Mandell also moved for a new trial, arguing that the government had withheld important exculpatory information about the source of the gun. We affirm because we agree with the district judge that the information is irrelevant and the evidence supporting Mandell's gun convictions was overwhelming.

## I. BACKGROUND

### A. Mandell's History

Defendant Steven Mandell, formerly known as Steven Manning, is familiar to us. We discuss his unusual history because it is relevant to his current appeal. As we have previously described: "[Mandell] was employed as a Chicago police officer and later as an FBI informant. In 1986 after [he] ceased to be an informer for the FBI he fell under suspicion for a variety of crimes." *Manning v. Miller*, 355 F.3d 1028, 1030 (7th Cir. 2004) (*Manning III*).

### 1. Missouri Kidnapping

In 1990, Mandell and a man named Gary Engel were charged for a kidnapping that occurred in Missouri in 1984. *See Manning v. Bowersox*, 310 F.3d 571, 574 (8th Cir. 2002) (*Manning II*). What happened next is noteworthy:

>Because [Mandell] was also a suspect in an Illinois murder, the FBI planted a government informant in his cell to try to collect evidence about the Illinois crimes. The informant's agreement specified that he was not to elicit any information about [Mandell's] pending Missouri charges. However, the informant did talk about the Missouri charges, and agreed to help [Mandell] fabricate an alibi defense using the informant's girlfriend, Sylvia Herrera. The FBI then met with Herrera to go over what information she should attempt to elicit from [Mandell]. Pursuant to her agreement with the FBI, Herrera began to record her conversations with [Mandell]. *Id*.

Mandell was convicted but the Eighth Circuit granted his habeas petition, holding that the government's use of informants, after charges had been filed, violated his constitutional right to counsel. *Id*. at 577. Missouri declined to retry him. *See Manning v. United States*, 546 F.3d 430, 431 (7th Cir. 2008) (*Manning IV*). Gary Engel was tried separately and convicted, but his conviction was vacated because the government failed to disclose that one of its witnesses had been paid to testify. *See Engel v. Buchan*, 710 F.3d 698, 700–01 (7th Cir. 2013).

### 2.  Illinois Murder

In 1993, Mandell was charged for a murder that occurred in Illinois in 1990. *See Manning III*, 355 F.3d at 1030. Mandell tried to pin the murder on Engel, "who had ties to both [Mandell] and the victim." *People v. Manning*, 182 Ill.2d 193, 204 (1998) (*Manning I*). Mandell was convicted but this conviction

was vacated too—this time because the trial judge admitted inadmissible evidence. *Id*. at 215–18.

### 3. Civil Suit

In 2002, Mandell sued the government for maliciously prosecuting him, and two FBI agents for fabricating evidence against him. *See Manning III*, 355 F.3d at 1030–31; *Manning IV*, 546 F.3d at 431. A jury found against the agents and awarded Mandell $6.5 million. *Id*. at 431–32; *Engel*, 710 F.3d at 701. But a judge found that even without the fabricated evidence, the government had probable cause to prosecute. *See Manning IV*, 546 F.3d at 431–32; *Engel*, 710 F.3d at 701. For technical reasons not pertinent here, the upshot is that Mandell recovered nothing. *Manning IV*, 546 F.3d at 438; *see also Engel*, 710 F.3d at 701.[1]

### B. Events Leading to This Case

In the summer of 2012, Mandell was introduced to George Michael, a real estate businessman. Though not on Mandell's level, Michael's reputation was not unblemished. *See Michael v. FDIC*, 687 F.3d 337 (7th Cir. 2012) (affirming civil penalties and order barring Michael from participating in the affairs of any FDIC-insured bank). Unbeknownst to Mandell, Michael was an FBI informant. Michael recorded several of their conversations, including discussions about two criminal plots, discussed below.

---

[1] Engel filed his own civil suit, which was carried on by his estate after he died in jail in 2012. His estate received a $3 million settlement from some defendants and voluntarily dismissed the claims against others. *See Engel v. Buchan et al.*, No. 1:10-CV-3288 (N.D. Ill.).

### 1. Plot One: Steven Campbell

In one plot, Mandell was to kidnap, torture, extort, and kill Steven Campbell, a wealthy businessman. Mandell planned to kidnap Campbell, take him to a remote location, torture him until he turned over cash and property, and then kill him. Michael helped Mandell rent a building to serve as the torture site, which they nicknamed "Club Med." Although Mandell said that he had an accomplice, he refused to identify that person.

Seeking to install hidden cameras at Club Med, the FBI asked a federal court to authorize a wiretap. Special Agent Richard Tipton submitted an affidavit in support of the application. Tipton explained that Mandell had an accomplice whom he refused to identify, and whom the FBI had been unable to identify by traditional means. Tipton stated that video was required for two reasons: to identify the accomplice, and to gather evidence to prove both Mandell and the accomplice guilty beyond a reasonable doubt. The court approved the application and the FBI installed the cameras.

The cameras served both intended purposes. First, the videos revealed that the accomplice was Gary Engel—the same Gary Engel who was charged with Mandell in the 1984 Missouri kidnapping, and the same Gary Engel on whom Mandell had tried to pin the 1990 Illinois murder. Second, the evidence gathered was devastating to the defendants. As Mandell's opening brief on appeal admits, the videos show Mandell and Engel "discuss[ing] in graphic detail the alleged kidnapping, extortion, and murder of Campbell."

### 2. Plot Two: Anthony Quaranta

Mandell and Michael also discussed a second plan (and this plan, too, involved Mandell killing someone). Michael was a part-owner of a local strip club, and Mandell agreed to murder Anthony Quaranta, one of the other owners, to increase Michael's ownership and control. In furtherance of this plan, Mandell tried to locate Quaranta using the services of a company named Covert Track.

### C. Procedural History

Mandell and Engel were arrested on their way to kidnap Campbell. A loaded gun was found in the subsequent search of Club Med. While in pre-trial custody, Mandell called his wife and asked her to move and destroy some evidence related to the Steven Campbell plot.

Mandell was charged with: (i) conspiring to kidnap Steven Campbell; (ii) conspiring to extort Steven Campbell; (iii) attempting to extort Steven Campbell; (iv) possessing a gun in furtherance of a crime of violence; (v) possessing a gun as a convicted felon; (vi) attempting to obstruct justice; and (vii) conspiring to murder Anthony Quaranta. *See* 18 U.S.C. § 922(g)(1); § 924(c)(1)(A); §§ 1201(a)(1), (c); § 1512(b)(2)(B); § 1951(a); § 1958(a).

Mandell moved to suppress the wiretap evidence. He argued that, even without the wiretap, the FBI knew that Engel was the accomplice—so the wiretap was unnecessary and the supporting affidavit was false. That motion was denied. Mandell testified at trial and admitted to devising and discussing both criminal plots, but said he never intended to carry them out. Instead, he said that Michael was paying him about

$1,000 a week, so he played along just to feed Michael's fantasies and continue getting paid. Mandell was acquitted of conspiring to kill Quaranta, but convicted on all other counts—which all related to the Steven Campbell plot—and sentenced to life in prison. He re-raised his wiretap argument in a motion for a new trial, which was denied, and he presses that argument on appeal.

Mandell also moved for a new trial based on evidence he discovered after trial concerning the source of the gun that was found at Club Med. He appeals the district judge's denial of that motion. Finally, the district judge denied in part Mandell's post-trial motion for a return of property, and Mandell filed an appeal. But Mandell said nothing about that issue in his briefs so we summarily affirm that part of this consolidated appeal.

## II. ANALYSIS

### A.  Not Clear Error to Deny Motion to Suppress Without Holding Evidentiary Hearing

Before using a wiretap to gather evidence of crimes, the government must apply for court authorization and its application must meet certain statutory requirements. 18 U.S.C. §§ 2516, 2518(1). The statute also specifies facts that the judge must find before authorizing the wiretap. *Id*. § 2518(3). If either the application or the authorization is lacking, any resulting evidence is inadmissible. *Id*. § 2515. Further, the authorization is invalid if it was procured through the government's deliberate or reckless omission of material information from its application. *See United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013).

### 1. Wiretap Application Met Requirements

A wiretap application must state "the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b). The district judge found this requirement met, and we review that finding for clear error. *United States v. Fudge*, 325 F.3d 910, 917 (7th Cir. 2003). Under what is known as the "necessity" requirement, an application must also include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The necessity requirement binds judges too: before approving an application, the judge must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id*. § 2518(3)(c).

Despite its name, the necessity requirement "was not intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation." *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006) (citations and internal quotation marks omitted). Accordingly, "the government's burden … is not great" and "the requirement of exhausting other investigative procedures prior to obtaining a wiretap is reviewed in a practical and common-sense fashion." *Id*. (internal quotation marks omitted). The district judge found the requirement met, and we review that determination for an abuse of discretion. *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006).

The FBI's application, including Special Agent Tipton's affidavit, detailed the traditional investigatory methods that

had been attempted, explained why other traditional efforts would be futile or too dangerous, and urged that the wiretap was necessary in part to identify Mandell's accomplice in the Campbell plot. *See McLee*, 436 F.3d at 763 (noting that we have upheld the "necessity" of wiretaps on the basis that investigators were having trouble identifying other members of the conspiracy) (citing *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991)). Mandell argues that the FBI *already knew* that Engel was the accomplice, so the wiretap was invalid both because the application failed to list Engel as someone "committing the offense and whose communications are to be intercepted," and because the necessity requirement was not met. Mandell urges that, before it submitted its application, the government was aware of substantial ties between himself and Engel, including:

- Mandell met with Engel and Engel inspected the car that was later used in the Steven Campbell plot. The meeting was less than two weeks before the FBI submitted its application.

- Mandell and Engel used the same Covert Track account to track people.

- Mandell and Engel made many phone calls to each other between August and October 2012.

- Mandell and Engel were both tried and convicted for the 1984 kidnapping; both had their convictions vacated; and both filed related civil suits.

Mandell's argument is entirely hindsight. He lists all the known connections between himself and Engel and then backdates them to argue that the FBI should have known En-

gel was his accomplice. But Mandell could list extensive con-
nections with numerous people (including his wife, relatives,
neighbors, and so on). Even focusing on suspected criminals,
Mandell had substantial connections with many such people,
as his lawyer acknowledged at oral argument.

Further, without hindsight, the connections that Mandell
highlights were not obviously related to the plot to kidnap,
torture, extort, and kill Steven Campbell. For example, Man-
dell makes much of the fact that Engel inspected a car, and
that car was later used in the Campbell plot. Mandell neglects
to mention that the car was *also* used to conduct surveillance
of Anthony Quaranta. More fundamentally, Mandell does not
explain how the *subsequent* use of the car in the Campbell plot
would have informed the FBI *at the time Engel was observed in-
specting the car*, that Engel was tied to the Campbell plot. (To
see the argument's flaw clearly, imagine Mandell had made
the absurd argument that Engel was obviously involved in the
Campbell plot because Engel shook Mandell's *hand*, and that
is *the same hand* that Mandell planned to use to torture Camp-
bell.)

Arguably, the evidence of an in-person meeting (right af-
ter Mandell conducted surveillance of Quaranta), car inspec-
tion, and joint use of a Covert Track account connected Engel
to the plot to kill Quaranta. (We say "arguably" because the
district court found the evidence tying Engel to that plot to be
"slim, at best," and Mandell has not called that characteriza-
tion into question.) But the Quaranta and Campbell plots
were entirely separate. Indeed, even with the wiretap evi-
dence, the jury *acquitted* Mandell of the counts related to
Quaranta. So even if the FBI suspected that Engel might be
involved in the Quaranta plot, it does not follow that the

agency must have known he was the Campbell accomplice. Similarly, the fact that Engel and Mandell had phone conversations does not suggest that Engel was planning to kidnap, torture, extort, and kill someone. And we agree with the government that it would be preposterous for the FBI to have concluded that Engel was the accomplice based on the vacated convictions and civil suits stemming from the 1984 Missouri kidnapping prosecution. The district court did not clearly err in finding that the FBI did not know, at the time of its application, that Engel was the accomplice in the Campbell plot.

Moreover, even if the FBI *did* know that Engel was the accomplice, the application also urged that the wiretap was needed to: (i) ascertain each defendant's role in the plot, *see United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995); and (ii) obtain evidence to prove each defendant guilty beyond a reasonable doubt, *see United States v. Campos*, 541 F.3d 735, 748 (7th Cir. 2008); *Fudge*, 325 F.3d at 919. The wiretap served those purposes. Mandell argues that the government did not need the video evidence because it already had recordings of Mandell's conversations with George Michael. But remember, Mandell told the jury that he was role playing, to feed Michael's fantasies and continue getting paid. The recorded conversations are consistent with that story. In contrast, the videos from Club Med, in which Mandell and Engel discuss their plans in gruesome and tedious detail even though Michael is not present, are not consistent with "fantasies."[2]

---

[2] Mandell said that the videos are consistent with his story because he assumed he was being watched by Michael, who Mandell assumed had installed hidden cameras at Club Med. The jury was entitled to reject that unlikely story, especially given the level of detail of the videotaped preparations.

The necessity is even clearer in relation to Engel. "[T]he government's burden of proof at trial is substantially higher than its burden in obtaining an indictment," so a wiretap can be necessary "even if the government [has] enough evidence to indict." *Campos*, 541 F.3d at 748 (citing *McLee*, 436 F.3d at 763). We have already discussed the dearth of evidence identifying Engel as the accomplice. Especially considering the increased burden of proof at trial, it is clear that the district judge did not abuse her discretion in finding the necessity requirement met.

### 2.  No Hearing Was Required

The considerations discussed above also lead us to affirm the denial of Mandell's motion for an evidentiary hearing. Under *Franks v. Delaware*, 438 U.S. 154 (1978), and its progeny, a wiretap order is invalid—even if the application and authorization meet all the statutory requirements—if the order was obtained by the government's deliberate or reckless omission of material information from its application. *See McMurtrey*, 704 F.3d at 504; *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008). A defendant is entitled to an evidentiary hearing to prove his case, but only if he first makes a "substantial preliminary showing." *McMurtrey*, 704 F.3d at 504. Mandell asked for a hearing, complaining about the government's failure to lay out all of the previously discussed connections between Mandell and Engel. The district court declined to hold a hearing and we review that decision for clear error. *Id.* at 508. But Mandell was not entitled to a hearing because he did not (and could not) make a substantial preliminary showing that the government's application would have been denied if it laid out those connections. *See McMurtrey*, 704 F.3d at 509; *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010); *Carmel*, 548

F.3d at 577. As discussed above, the connections did not establish that Engel was Mandell's accomplice, and even if they did, the wiretap was still necessary to collect evidence needed to prove each man guilty beyond a reasonable doubt. So the district judge did not clearly err by refusing to hold a hearing.

### B. Not Abuse of Discretion to Deny Motion for New Trial Based on Gun Evidence

A search of Club Med turned up a loaded gun—a Ruger. A year before trial, the government turned over a firearms trace summary showing only one recorded transaction: "Individual A" bought the gun in 1980. At trial, Mandell testified that the gun was planted at Club Med, by George Michael, without Mandell's consent. The jury either did not believe him, or found that story irrelevant, as it convicted him on two relevant counts: possessing a gun in furtherance of a crime of violence, and possessing a gun as a convicted felon. *See* 18 U.S.C. §§ 922(g)(1), 924(c)(1)(A).

In a pro se post-trial motion, Mandell argued for a new trial, urging that both George Michael and "Individual A" were tied to the leader of a criminal organization in Chicago. (As to Individual A, the connection was apparently based on her last name, which was similar to the last name of the crime leader.) Why such connections would warrant a new trial is unclear. In any event, the government responded by saying it had no evidence that the gun was traceable to either the crime leader or George Michael. The government turned over two reports of interviews conducted by the Internal Revenue Service. The reports were redacted because they concerned an unrelated matter, but they involved Individual A.

Mandell moved for a new trial, arguing that by not turning the reports over earlier, the government had violated its obligation to disclose exculpatory evidence. *See Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963). The district judge denied that motion, and we review that decision for an abuse of discretion. *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). "A *Brady* violation occurs when the prosecution suppresses evidence favorable to the defense and the evidence was material to an issue at trial." *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012). A defendant is entitled to a new trial "only when … there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. (citations omitted).

Mandell cannot meet this standard. His theory of the Ruger's connection to George Michael, based in part on the IRS reports, is strange. He notes that Individual A bought the Ruger in 1980, and in 2005, her ex-spouse died and he owned about one hundred guns. Also, from 1976 until 1982, that ex-spouse had an ownership interest in a strip club, and at some point, George Michael acquired an ownership interest in the same strip club. Somehow Mandell says this all supports his theory that George Michael acquired the Ruger and planted it at Club Med. The district judge found otherwise and we cannot see how that was an abuse of discretion.

Regardless, whether the gun was connected in some way to George Michael is irrelevant. No matter how the gun arrived at Club Med, Mandell was aware of its presence and its planned use in the Campbell plot. Mandell and Engel are seen on video discussing the gun, confirming the type of bullet being used, and complaining about how difficult it was to load

while wearing rubber gloves. As Mandell admits in his opening brief on appeal, the videos reveal that "Engel loaded the Ruger prior to departing for Michael's office. Mandell asked Engel why he was loading it. After Engel responded why 'have it sitting around here unloaded,' Mandell replied 'good answer.'" No matter who owned the gun, or who was responsible for originally bringing it to Club Med, the evidence that Mandell *possessed* it (as a convicted felon and in furtherance of a crime of violence) was clear. So there is no "reasonable probability that, had the [IRS reports] been disclosed to the defense, the result of the proceeding would have been different." *Mota*, 685 F.3d at 648. The district judge did not abuse her discretion in denying Mandell's motion for a new trial.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.