In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 16-1776, 16-1777, 16-1780, 16-1832

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DONALD MAGGARD, DAVID BELL, JEREMY JACKSON, and DOROTHY NEELEY,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cr-00096 — **Sarah Evans Barker**, *Judge.*

_____

ARGUED JUNE 2, 2017 — DECIDED AUGUST 4, 2017

_____

Before FLAUM, EASTERBROOK, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. The government brought charges related to a methamphetamine-distribution conspiracy in southern Indiana against nineteen people, fifteen of whom pled guilty to at least one charge. The remaining four—the defendants-appellants here—went to trial. A jury convicted them.

The defendants raise five arguments on appeal—three concerning the district court's denial of the defendants' pretrial motions and two concerning the sufficiency of the evidence considered by the jury. Because the court did not err in denying the pretrial motions and because the evidence that the government presented at trial was sufficient, we affirm.

## I. BACKGROUND

The defendants in this case are Donald Maggard, David Bell, Jeremy Jackson, and Dorothy Neeley. In one way or another, they were all involved in a vast methamphetamine-distribution conspiracy in and around North Vernon, Indiana from October 2013 through May 2014. Neeley, who lived in Indianapolis, supplied much of the methamphetamine that she and Maggard then distributed to other dealers in the area, including Bell and Jackson. The defendants sold much of that methamphetamine in Maggard and Jackson's home neighborhood, Country Squire Lakes—a North Vernon subdivision engulfed in drug activity.

Maggard regularly dealt methamphetamine to Bell, who then resold that methamphetamine to other customers. On at least some of these deals, Bell acted as a middleman, locating buyers for Maggard who would purchase methamphetamine from his suppliers for Bell's buyers. Maggard and Bell often discussed the details of these transactions on the phone and through text messages. And on at least one occasion, Bell joined Maggard on his trip to purchase methamphetamine from a supplier.

Neeley was Jackson's primary source for methamphetamine. On April 5, 2014, Neeley sold Jackson a particularly potent batch of capsulated methamphetamine that ultimate-

ly killed Jackson's wife Jessie. Jessie's death became a focal point of the government's case in the defendants' trial, so the details of that day are important for this appeal.

Early that day, Jackson and Jessie consumed some of Neeley's methamphetamine, and Jessie overdosed. A few hours later, Amanda Hadley and Christina Rodgers—two of Jackson's friends who were visiting his home—noticed that Jessie was sweating and convulsing in bed. Because Jackson was not assisting her, Hadley and Rodgers went into the bedroom and applied an icepack to her forehead. Jackson then asked Hadley and Rodgers to leave the room, so he could have sex with Jessie. Hadley and Rodgers complied, leaving Jackson's home.

Shortly thereafter, Jackson texted Desiree Booker, another friend, about Jessie's condition. Jackson sent Booker a photograph of Jessie, who was now unconscious. Two hours later, Booker and her girlfriend, Kylie Day, arrived at Jackson's home. Jessie was still in bad shape, yet Jackson was not tending to her. Instead, he was playing video games and listening to music. Jackson explained to Booker and Day that he and Jessie had taken a strong dose of methamphetamine and that he believed that Jessie was faking an overdose. When Booker and Day asked if they could take Jessie to the hospital, Jackson refused. Booker and Day then left.

Jackson then called Hadley and Rodgers, asking them to "come over here and help [him] before [he] knock[ed] this bitch out," referring to Jessie. (R. 998 at 86.) Hadley and Rodgers returned to Jackson's home and found Jessie collapsed on the floor. Hadley attempted CPR, and when Jackson refused to call an ambulance, Rodgers called one. Before the ambulance arrived, Jackson disposed of his drugs and

paraphernalia by passing them to a neighbor out the back door of his home.

When the paramedics arrived, Jessie was still alive but unconscious. They rushed her to the hospital but could not revive her. Jessie died at the hospital early the following morning. A sample of Jessie's blood tested positive for amphetamine and methamphetamine at six or seven times the level of a fatal dose. An autopsy confirmed Jessie's cause of death to be a methamphetamine overdose.

Meanwhile, the government had been engaged in an extensive investigation of the entire conspiracy. As part of its investigation, the government sought and obtained two orders authorizing wire and electronic surveillance of Maggard's phones. Through this surveillance, the government intercepted communications between Maggard, Bell, and Neeley, among many others. Many of these communications concerned the defendants' drug activity.

A grand jury indicted the defendants (and fifteen others) on twenty-three counts associated with their conspiracy to distribute methamphetamine. Specifically, Maggard was charged with conspiracy to distribute methamphetamine, unlawful use of a cellphone to facilitate the distribution of methamphetamine, and possession of methamphetamine with intent to distribute. Bell was charged with conspiracy to distribute methamphetamine and unlawful use of a cellphone to facilitate the distribution of methamphetamine. Jackson was charged with conspiracy to distribute methamphetamine and distribution of methamphetamine. And Neeley was charged with conspiracy to distribute methamphetamine, two counts of distribution of methamphetamine, and possession of methamphetamine with intent to distrib-

ute. The indictment also included allegations about several applicable sentencing enhancements, only one of which is relevant on appeal: "that death resulted from the use of methamphetamine distributed by [Jackson and Neeley]." (R. 175 at 16; R. 650 at 8.)

Before trial, the defendants filed several motions, three of which are involved in this appeal.

First, Maggard and Bell moved to sever their trial from that of Jackson and Neeley.

Second, Jackson moved to bifurcate the substantive allegations against him in the indictment (that he participated in the drug conspiracy and that he distributed methamphetamine) from the sentencing-enhancement allegation against him (that his distribution of methamphetamine resulted in Jessie's death). In so doing, Jackson sought to prevent the government from introducing evidence related to his wife's death, claiming that this evidence would be unduly prejudicial.

Finally, Maggard, Bell, and Neeley moved to suppress the government's wiretap evidence.

The district court denied each of these motions, and the defendants proceeded to a joint trial. At trial, Bell chose to represent himself with standby counsel present; the other defendants were represented by counsel.

After a ten-day trial, the jury convicted the defendants of all charges. The judge then sentenced Maggard, Bell, and Jackson to aggregate terms of life imprisonment followed by ten years of supervised release and Neeley to an aggregate term of 264 months' imprisonment followed by five years of supervised release. This appeal followed.

## II. ANALYSIS

On appeal, the defendants raise five arguments. Three of their arguments relate to the pretrial motions that the district court denied, and two relate to the sufficiency of the evidence considered by the jury.

We begin with the defendants' first three arguments: that the district court abused its discretion by denying (1) Maggard, Bell, and Neeley's motion to suppress the government's wiretap evidence, (2) Maggard and Bell's motion for a separate trial, and (3) Jackson's motion and subsequent objections to suppress evidence related to his wife's death.

We then turn to the defendants' arguments related to the sufficiency of the evidence: that the evidence presented to the jury was insufficient to show that (1) Bell was involved in the conspiracy and (2) Neeley supplied the methamphetamine that killed Jessie. We discuss additional facts as necessary in each of these sections.

*A. Admission of the Wiretap Evidence*

Maggard, Bell, and Neeley first argue that the district court erred by not suppressing evidence that the government obtained using a wiretap.[1] As part of its investigation of the methamphetamine conspiracy, the government twice sought and obtained authorization from the district court to intercept communications on Maggard's telephones. In so doing, it listed Maggard, Bell, and Neeley, among many oth-

_____

[1] Because the government did not intercept Jackson's communications, he does not join the other defendants in this argument. Therefore, any use of the shorthand "defendants" in this section of the analysis refers only to Maggard, Bell, and Neeley.

ers, as probable interceptees. Through this wiretap, the government intercepted approximately 4000 telephone calls and text messages, several of which it introduced as evidence at trial.

Congress codified the "[p]rocedure for interception of wire, oral, or electronic communications" in 18 U.S.C. § 2518. Among several other requirements, § 2518(1)(c) requires the government's application for electronic or wire surveillance to provide a "full and complete statement as to whether or not other investigative procedures [1] have been tried and failed or [2] why they reasonably appear to be unlikely to succeed if tried or [3] to be too dangerous." This is known as the "necessity requirement," and it obligates the government in its application for a wiretap to demonstrate that it has considered other methods of investigation and to explain why those methods have proven inadequate for one or more of the three listed reasons. *United States v. Mandell*, 833 F.3d 816, 821 (7th Cir. 2016).

"Despite its name, the necessity requirement 'was not intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation.'" *Id.* (quoting *United States v. McLee*, 436 F.3d 751, 762–63 (7th Cir. 2006)); *see also United States v. Fudge*, 325 F.3d 910, 919 (7th Cir. 2003) (holding that the "evil we are trying to avoid" in these cases is the "routine use of wiretaps as an initial step in the investigation"). Accordingly, the government's burden in applying for a wiretap "is not great," and the "requirement of exhausting 'other investigative procedures' prior to obtaining a wiretap is 'reviewed in a practical and common-

sense fashion.'" *McLee*, 436 F.3d at 763 (quoting *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995)).

When a district court conducts its common-sense review of the government's application for a wiretap, the statute explicitly requires it to consider the government's "full and complete statement" on necessity. *See* 18 U.S.C. § 2518(3)(c); *see also Mandell*, 833 F.3d at 821 ("The necessity requirement binds judges too … ."). This means that, before granting such an application, the court must affirmatively "determine[] on the basis of the facts submitted by the applicant" that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). If the court concludes that the government has made this showing (and that all of the statute's other requirements have been met), then the court may grant the government's application.

Here, to comply with the statute's necessity requirement, the government described in detail the investigative techniques that it either had already attempted or had ruled out for various reasons. The government further explained in affidavits supporting its applications why these traditional investigative techniques had proven unsuccessful or had been ruled out.

The court granted the government's applications, determining, among other things, that the government had shown that a wiretap was statutorily necessary. The defendants claim that this was an error. We review the district court's determination of the statute's necessity requirement for abuse of discretion. *Mandell*, 833 F.3d at 821.

In claiming that the district court erred, the defendants first quibble with the language that the court used in its orders granting the government's applications. The court's language in those orders tracked the language of the statute. For example, the court concluded that the government had established that "normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." (R. 608-3 at 3; R. 608-6 at 4.) The defendants claim that the district court's use of this "conclusory language" without further exposition "reduced [the court's] statutory burden" and was facially insufficient. (Appellants' Br. at 24–25.)

We disagree. In asserting this argument, the defendants confuse the statutory requirements for the government's wiretap *application* (which require the applicant to provide a "full and complete statement" explaining why a wiretap is necessary) with the requirements for a district court's language in an *order* granting such an application (which do not demand the same "full and complete statement"). *Compare* 18 U.S.C. § 2518(1), *with* 18 U.S.C. § 2518(3). The defendants' confusion is best exemplified by their citation to *United States v. Castillo-Garcia*, a Tenth Circuit case discussing the requirement that wiretap *applications* not use "generalities[] or statements in the conclusory language of the statute" but saying nothing about the requirements of the court's *order*. 117 F.3d 1179, 1188 (10th Cir. 1997), *overruled on other grounds by United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002).

Contrary to the defendants' assertion, the "full and complete" statement requirement, which the statute imposes on the government's wiretap applications, does not apply to the

language of the court's orders granting those applications. Instead, all that is required of a court's language in granting an application is a determination "on the basis of the facts submitted by the applicant" that the statute's requirements have been met. 18 U.S.C. § 2518(3)(c).[2] The district court's orders here, which made such determinations, were therefore facially sufficient.

Alternatively, the defendants argue that the government's applications and affidavits did not establish statutory necessity. They thus contend that the district court abused its discretion by granting those applications.

As mentioned above, when reviewing a district court's finding of necessity, we typically defer to that court, which is in the best position to gauge the government's true need for the wiretap. *See Mandell*, 833 F.3d at 821. In so reviewing, we "look at each case individually, considering the practicalities of each investigation and using our good reason and common sense." *United States v. Campos*, 541 F.3d 735, 749 (7th Cir. 2008). We will affirm a district court's finding of necessity under § 2518(3)(c) so long as "there exist[ed] a factual predicate [for that finding] in the affidavit." *United States v. Goodwin*, 496 F.3d 636, 640 (7th Cir. 2007) (quoting *United States v. Zambrana*, 841 F.2d 1320, 1330 (7th Cir. 1988)).

Here, the government's affidavits revealed that the government was not trying to use a wiretap as its initial investigative tactic. Rather, the government's first affidavit dis-

---

[2] 18 U.S.C. § 2518 discusses additional, technical requirements of a court's order granting a wiretap. But the defendants do not challenge the court's orders here on any of these technical grounds.

closed in detail the many other investigative techniques that the government had employed or had ruled out in its investigation of the defendants' methamphetamine conspiracy. And the same is true of the government's second affidavit, which divulged in even greater detail the investigative efforts that the government had considered. These efforts included the use of (1) confidential sources, (2) undercover agents, (3) grand jury subpoenas and immunity grants, (4) search warrants, (5) pen registers and toll records, and (6) physical surveillance. The affidavits further explained, again in detail, why each of these methods either had proven ineffective or had been ruled out.

For instance, the government's affidavits listed six different confidential sources that the government had used in its investigation. And for each of these sources, the government meticulously described why that source's cooperation had "not accomplish[ed] the [government's enumerated] investigative objectives." (R. 608-2 at 29, 30; R. 608-5 at 22, 23, 24, 25, 26, 27.)

Similarly, the government's affidavits explained in detail the government's decisions to forgo the use of undercover agents, grand jury subpoenas, and immunity grants. Because its confidential informants had told it "that Maggard would not sell methamphetamine to someone whom he [did] not know because of a concern that the unknown individual might be an undercover law enforcement officer or a confidential informant," the government chose not to employ undercover agents. (R. 608-2 at 33; R. 608-5 at 28.) Likewise, because the government had not yet identified all of the conspiracy's participants and "because the granting of … immunity [for only identified conspirators] might foreclose

prosecution of the most culpable members of this conspiracy," the government forwent the use of grand jury subpoenas and immunity grants. (R. 608-2 at 34; R. 608-5 at 31.)

The government's justifications for its decision not to use search warrants were equally as detailed. The government disclosed that it had "conducted physical surveillance" of Maggard's residence and that it had "considered obtaining and executing a search warrant at this residence." (R. 608-2 at 34; 608-5 at 31.) But for several reasons—including that (1) "[t]he FBI [did] not have any current source of information that [could] convey information concerning the delivery of methamphetamine to Maggard," (2) "[e]xecuting search warrants would alert the subjects of the investigation and thwart any opportunity to learn the identities of more co-conspirators," and (3) "it [was] highly unlikely that Maggard and all of his principal associates would be present at any one location upon the execution of the search warrant"—the government believed that search warrants would be ineffective in its investigation. (R. 608-2 at 35.) In the government's affidavit in support of its second application, the government described in even greater detail the additional surveillance it had conducted and why it remained convinced that search warrants would not be helpful to its investigation.

The same is true of the government's explanations for why pen registers and toll records had not adequately aided its investigation. In its affidavits, the government first described the "significant limitations" of these investigative tools—namely, that they "do not provide 'real time' information regarding the contact" and that they "cannot establish the actual identity of the speakers or the subject matter of their conversation." (R. 608-2 at 36; R. 608-5 at 34.) The

government then explained in detail why those limitations had impeded its investigation of the defendants' methamphetamine conspiracy.

Finally, the government's affidavits outlined the government's extensive use of physical surveillance, which included "roving surveillance" outside Maggard's and others' residences as well as "physical surveillance" of Maggard himself. (R. 608-2 at 36–38; R. 608-5 at 35–37). Stating that "[t]he nature of [Maggard's] neighborhood render[ed] sustained surveillance impractical" and that "introducing a surveillance vehicle into the neighborhood, which residents [had] never seen before, would attract attention and may alert [Maggard] of the ongoing investigation," the government concluded that this traditional method of investigation would "not accomplish [its] investigative objectives." (R. 608-2 at 36–38; R. 608-5 at 36–38.)

As the above details illustrate, the government's thorough affidavits "easily established" the requisite factual predicate to support the district court's finding that a wiretap was statutorily necessary. *See United States v. Durham*, 766 F.3d 672, 680 (7th Cir. 2014). Thus, the court did not abuse its discretion in denying the defendants' motion to suppress.

*B. Maggard and Bell's Motion for a Separate Trial*

Maggard and Bell next contend that the district court erred by denying their motion to sever their trial from that of Jackson and Neeley. Unlike Jackson and Neeley, Maggard and Bell were not charged with distribution resulting in death. So before their trial, they argued for severance, claiming that any evidence of Jessie's death—which the government would have to present to convict Jackson and Neeley—

would unduly prejudice a jury against them. *See* Fed. R. Crim. P. 14(a) ("If the joinder of … defendants in … a consolidation for trial appears to prejudice a defendant or the government, the court may … sever the defendants' trials, or provide any other relief that justice requires.").

The district court denied that motion, so the defendants proceeded to a joint trial. Importantly, Maggard and Bell did not renew their motion for severance at the close of evidence despite having an opportunity to do so.

Ordinarily, we review a district court's denial of a defendant's motion to sever for abuse of discretion. *United States v. Cardena*, 842 F.3d 959, 980 (7th Cir. 2016). "A defendant, however, waives the issue if he does not renew his severance motion *at the close of evidence*." *Id.*; *see also United States v. Brown*, 870 F.2d 1354, 1360 (7th Cir. 1989) ("A motion for severance is typically waived if it is not renewed at the close of evidence, primarily because it is then that any prejudice which may have resulted from the joint trial would be ascertainable."). And a "waiver of this nature" usually "preclude[s] appellate review of any kind." *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009).

Maggard and Bell do not dispute that they failed to renew their motion at the close of evidence. Rather, they claim that their failure to do so—which they agree would typically result in a waiver—should be excused because renewal would have been futile. We have held that futility can excuse a defendant's failure to renew a motion to sever: "when the defendant is able to show that refiling the motion [to sever] would be useless, he may be excused from engaging in what is then a futile exercise." *Brown*, 870 F.2d at 1360.

To support their argument for futility, Maggard and Bell contend that the district court "had been adequately apprised of the objection and motion well before [t]rial and at the time that the evidence regarding the death of [Jessie] was presented. Moving again at the end of the case would not have made a difference. The evidence was presented as expected with no surprises." (Appellants' Br. at 40–41.) And much of that is true: Maggard and Bell filed a pretrial motion to sever, and they lodged a continuing objection during trial based on Federal Rule of Evidence 403—that the evidence of Jessie's death would be unduly prejudicial. And the district court considered and rejected these arguments every time they were raised.

But did these efforts necessarily render *useless* a renewal of the motion to sever at the close of evidence? We think not.

We have held that a defendant's timing for filing a motion to sever is "important because the close of evidence is the moment when the district court can fully ascertain whether the joinder … was unfairly prejudicial to the defendant's right to a fair trial." *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002). Although a court before trial can attempt to predict whether the defendants will be prejudiced by a joint trial, it cannot "fully ascertain" the prejudicial impact until all of the trial evidence has actually been admitted. *Id.* Thus, a renewed motion at the close of evidence is essential in these cases unless the court explicitly indicates that such a renewed motion will not be entertained.

Here, Maggard and Bell had a clear opportunity to renew their motion to sever: at the close of evidence, the court asked Maggard's counsel and Bell (who was representing himself) if there was "anything further that needs to be

raised with the Court at this point," or if there were "any motions that need to be made." (R. 993 at 169.) They responded by discussing other motions, but they did not renew their motion to sever.

Admittedly though, this case is not as clear as some of our other decisions in which we have rejected a defendant's excuse for not renewing a motion to sever. For example, in *Brown*, the district court initially denied the defendant's motion to sever but also granted the defendant leave to refile it. 870 F.2d at 1360. We held that the court's explicit invitation to refile foreclosed any argument that refiling would have been futile. *Id.* Similarly, in *United States v. Phillips*, after previously denying a defendant's pretrial motion to sever, the district court specifically asked the defendant if he wanted to renew that motion. 239 F.3d 829, 838 (7th Cir. 2001). As in *Brown*, we concluded that the court's specific invitation to renew the previously denied motion to sever defeated the defendant's futility argument. *Id.*

Here, unlike in those cases, the district court did not explicitly grant Maggard and Bell leave to refile their motion to sever or ask them if they wished to renew that specific motion. Instead, the court denied Maggard and Bell's pretrial motion outright and asked at the close of evidence if the defendants had *any* motions to file without specifically referring to a renewed motion to sever.

That being said, we don't think those differences warrant a different result. If our rule requiring defendants to renew severance motions at the close of evidence is to have any teeth, we must enforce it except in rare cases where the court makes abundantly clear that filing such a motion would be useless. *United States v. Taglia*, 922 F.2d 413, 417 (7th Cir.

1991). This is not that case. Maggard and Bell waived their severance arguments by failing to renew their motion at the close of evidence despite having an opportunity to do so.

At any rate, even absent a waiver, the court didn't abuse its discretion in denying Maggard and Bell's motion to sever. Federal Rule of Criminal Procedure 8(b) broadly permits the joinder of criminal defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." The federal system prefers defendants who are indicted together also to be tried together. *United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003). This preference is especially strong with coconspirators. *Alviar*, 573 F.3d at 539 ("There is a strong preference that co-conspirators be jointly tried, particularly when they were indicted together.").

Joint trials "promote efficiency" and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 210 (1987)). But they can also prejudice the defendants who are tried together. *Id.* Because district courts are better positioned to balance the benefits of a joint trial with the potential prejudices that come with it, we generally leave Rule 14 severance decisions to the district courts' discretion. *United States v. Moore*, 115 F.3d 1348, 1361–62 (7th Cir. 1997). "[T]he defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion" by denying a severance motion. *Id.* (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 754 (7th Cir. 1988)).

To meet this burden, Maggard and Bell must show that the district court's decision caused them "actual prejudice,"

which is necessarily something more than that they would have had a better chance for an acquittal if granted a separate trial. *Souffront*, 338 F.3d at 828. Actual prejudice instead focuses on fairness: a reversal may be justified if the district court's denial of severance deprived Maggard and Bell of their right to a fair trial. *Rollins*, 301 F.3d at 518; *see also Zafiro*, 506 U.S. at 539 ("[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.").

Here, Maggard and Bell had a fair trial. The government presented a considerable amount of evidence unrelated to Jessie's death showing that Maggard and Bell had committed the crimes to which they were individually charged.[3] And this evidence would have been admissible against Maggard and Bell even if the district court had granted them a separate trial. *See United States v. Freland*, 141 F.3d 1223, 1227 (7th Cir. 1998) (concluding that "sufficient evidence to support convictions" counted against a finding of prejudicial joinder).

Moreover, the court took significant steps to ensure that the joint trial would be fair for all of the defendants. For instance, the court instructed the jury that, "[e]ven though the defendants are being tried together, you must consider each defendant and the evidence concerning that defendant separately as to each charge. Your decision concerning one de-

---

[3] We discuss the sufficiency of the government's evidence against Bell below.

fendant, whether it is guilty or not guilty, should not influence your decision concerning any other defendant." (R. 796 at 8.) Furthermore, the court's instructions made clear that Jessie's death pertained only to charges against Jackson and Neeley and not to any of the other defendants. The court also instructed the jury that it could hold a defendant liable for Jessie's death only if "the defendant you are considering was part of the distribution chain that led to her death." (R. 796 at 36.)

Rule 14 does not *require* severance in every joint trial in which there is a risk for prejudice; "rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 539. And as the Supreme Court has held, less drastic measures than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.; see also United States v. Warner*, 498 F.3d 666, 702 (7th Cir. 2007) (holding that the district court's use of limiting instructions and other measures defused any risk of prejudice). Here, the court's jury instructions did just that: they helped cure any risk of prejudice resulting from the joint trial.

"In all but the 'most unusual circumstances,' the risk of prejudice arising from a joint trial is 'outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *Alviar*, 573 F.3d at 539 (quoting *United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir. 1985)). This case does not present such unusual circumstances warranting severance. Even if Maggard and Bell had not waived their argument regarding severance, the court did not abuse its discretion in denying their motion to sever.

*C. Jackson's Objections to Evidence of His Wife's Death*

In a similar vein, Jackson also contests the district court's handling of the government's evidence surrounding Jessie's death. Before and during trial, Jackson sought to prevent the government from introducing evidence related to his wife's death. But the court denied his pretrial motion and his objections at trial. Jackson now contends that the court erred by denying his efforts to suppress that evidence.

Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "The amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses." *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012). The greater the evidence's probative value, the more willing we are to tolerate a greater risk of prejudice. *Id.* We give "considerable deference" to a district court's evidentiary decisions under Rule 403 and will overturn only for abuse of discretion. *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). [4]

---

[4] The government argues that we should employ the more stringent plain-error standard of review here rather than an abuse-of-discretion standard because Jackson's argument is "almost entirely new on appeal." (Appellee's Br. at 32.) In so arguing, the government claims that Jackson's motion to bifurcate and his (and the other defendants') continuing objection at trial pertained only to the admission of *the fact* of Jessie's death and not to the admission of *the details surrounding* her death. The government further points out that the defendants did not explicitly object at

(continued…)

To convict Jackson of distribution of methamphetamine *resulting in death*, the government necessarily had to present evidence showing that Jessie in fact died because of that distribution. And Jackson concedes as much on appeal.

Jackson, however, challenges the district court's admission of the government's evidence depicting the *details surrounding* Jessie's death. Specifically, Jackson challenges as unduly prejudicial and unnecessary the government's evidence that he (1) took and sent photographs of Jessie, (2) had sex with her, (3) refused to call an ambulance for her, and (4) played video games instead of assisting her, all while Jessie was suffering from an overdose.

We agree that some of this evidence was prejudicial; indeed, Jackson's behavior during his wife's death was deplorable. But when viewed in context, we also think that this evidence was highly probative. *See Boros*, 668 F.3d at 909 ("[B]oth probative value and prejudice must be determined in context."). And we disagree that the probative value of this evidence was outweighed by any prejudice that it may have caused.

As discussed above, the government had to prove that Jessie died because she consumed methamphetamine that

---

(…continued)

trial to the admission of these details. Jackson counters that the continuing objection to the admission of evidence of Jessie's death implicitly encompassed an objection to the admission of evidence of the details surrounding her death. Because we think Jackson's argument fails under even the less-stringent abuse-of-discretion standard, we decline to decide whether the plain-error standard should apply here or whether Jackson's argument could survive that standard.

Jackson and Neeley distributed. Several witnesses testified that Neeley sold Jackson a potent batch of methamphetamine on April 5, 2014, the day that Jessie overdosed. Thus, the government had to show that it was this potent methamphetamine—as opposed to some other methamphetamine—that killed Jessie.

The government elicited most of the evidence that Jackson contests from four witnesses: Booker, Day, Hadley, and Rodgers. The combined testimony of these witnesses was critical to the government's case because these witnesses interacted with Jessie and Jackson at different times on April 5, and together, they could tell a nearly complete story of that day. Because these witnesses arrived at and left Jackson's home at varying points throughout the day, the details elicited during their testimony—which Jackson argues were unnecessary and unduly prejudicial—were therefore necessary to weave the witness's accounts into a unified depiction of the events that led to Jessie's death.

For instance, Booker testified that she and Day had been living at Jackson's home on and before April 5, that they had left the home early that day, and that they had seen Neeley's car parked in the driveway later that morning. She further testified that she had witnessed Jackson purchase methamphetamine from Neeley on several occasions and that Jackson and Neeley did not typically interact for any reason other than for the sale of methamphetamine. She finally testified that Jackson had told her that Neeley's methamphetamine had caused Jessie's overdose. Day's testimony corroborated Booker's. These witnesses were thus essential to prove that it was Neeley's methamphetamine that caused Jessie's death. But because they were not at Jackson's home for key portions

of that evening, the government had to use other witnesses to fill in the gaps.

Hadley and Rodgers, who had visited Jackson's home multiple times on April 5 while Booker and Day were not present, helped complete the story of that evening. Hadley's testimony that Jackson had sex with Jessie while she was overdosing was important to show what Hadley and Rodgers witnessed before they first left Jackson's home. And Rodgers's testimony about Jackson's refusal to call an ambulance when she and Hadley finally returned to Jackson's home later that evening explained why Rodgers had to call for help and how Jessie eventually made it to the hospital.

Similarly, Booker's and Day's testimony about Jackson's photograph of Jessie helped convey why Booker and Day returned to Jackson's home on April 5—because they were justifiably worried about Jessie. And their testimony about Jackson playing video games revealed what they first saw when they arrived to help Jessie.

The details of the combined testimony of these witnesses also helped confirm that the methamphetamine that killed Jessie came from Jackson and Neeley. For example, the government's evidence of Jackson's peculiar behaviors on April 5—including that he played video games and had sex with Jessie during her overdose—illustrated Jackson's mindset that day and suggested that he too had consumed a dose of strong methamphetamine. Because these witnesses also testified that Neeley was Jackson's principal source for methamphetamine, the details helped connect Neeley's methamphetamine to Jackson. This brought the government one step closer to connecting that same methamphetamine to Jessie.

Likewise, the photograph of Jessie that Jackson sent to Booker, which Jackson sent in conjunction with a text message saying that he thought Jessie had "overduckied," further confirmed that Neeley's methamphetamine killed Jessie. (R. 986 at 146–47.) Because Booker testified that Jackson referred to taking capsules of methamphetamine as "spunducky" and because Neeley sold Jackson capsulated methamphetamine on April 5, the photograph of Jessie and its corresponding text message tended to show that it was Neeley's methamphetamine that caused Jessie's overdose. (*Id.* at 129, 146–47.)

In sum, although the details of April 5 are appalling, we think they were necessary—especially when viewed in context—to tell the full story of that day and to connect Jessie's death to the methamphetamine that Jackson and Neeley distributed. The district court did not abuse its discretion in admitting this evidence.

### D. Bell's Involvement in the Conspiracy

Bell next claims that his relationship with Maggard—the only defendant with whom Bell concedes that he had any illegal dealings—was far more limited than the government portrayed at trial. Bell describes his relationship with Maggard as merely that of a buyer and seller: although he admits that he purchased narcotics from Maggard "on a regular basis," he claims that he was not a party to any larger conspiratorial arrangement. (Appellants' Br. at 36.) He thus contends that the government's trial evidence was insufficient to establish that he was involved in the methamphetamine conspiracy at all.

The defendant bears a heavy burden when arguing that a jury based its guilty verdict on insufficient evidence. *United States v. Burns*, 843 F.3d 679, 684 (7th Cir. 2016). In fact, we've often described this burden as "nearly insurmountable." *E.g., id.* (quoting *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016)). To prevail, the defendant "must convince us that even after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *Dessart*, 823 F.3d at 403 (quoting *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010)). In other words, we will reverse a conviction for insufficient evidence only "'when the record contains *no evidence*, regardless of how it is weighed, from which the trier of fact could find guilt beyond a reasonable doubt' as to each element of the crime." *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015) (emphasis added) (quoting *United States v. Domnenko*, 763 F.3d 768, 772 (7th Cir. 2014)).

To support a conviction for conspiracy, the government must prove that "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Thomas*, 845 F.3d 824, 830 (7th Cir. 2017) (quoting *United States v. Vaughn*, 722 F.3d 918, 928 (7th Cir. 2013)). Where, as here, a drug distribution conspiracy is charged, the analysis is somewhat more complex.

Because the sale of drugs is itself a substantive crime that necessarily involves multiple parties, the parties' agreement to complete that sale does not by itself also constitute a conspiracy. *See United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009) ("[T]he sale of drugs, without more, does not constitute a conspiracy because the sale itself is a substantive

crime."). Instead, to prove a distribution conspiracy, "the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010). The parties' agreement to distribute may be (and often is) implicit, and the government can prove the existence of an agreement with either direct or circumstantial evidence. *Thomas*, 845 F.3d at 830.

Bell claims that the government did not meet its burden because it established only that Maggard and Bell were involved in a buyer-seller relationship and not that they agreed to engage in any further illegal activity. But that is simply not true. The jury heard both direct and circumstantial evidence of Bell's involvement in the distribution conspiracy.

As for direct evidence, the government introduced numerous text messages and audio files of calls between Maggard and Bell, which revealed that the two worked together to procure specific amounts of methamphetamine from Maggard's suppliers for some of Bell's customers. This evidence exposed Bell's role as a middleman in these transactions: he collected money from his customers, exchanged it with Maggard for a predetermined amount of methamphetamine, and then distributed that methamphetamine to the customers. Other messages and calls showed that Maggard and Bell contacted each other to arrange additional drug transactions and to make sure that neither had drawn any attention from law enforcement. Finally, the government's direct evidence revealed that, at least on one occasion, Bell

joined Maggard on a trip to collect methamphetamine from one of Maggard's suppliers.

And as for circumstantial evidence, the government questioned witnesses about Bell's relationship with Maggard. These witnesses testified that Maggard often "fronted" drugs to Bell on credit and that the two had been involved in repeated dealings. "The fronting of large quantities of drugs, combined with evidence of repeated transactions and a prolonged relationship between the purported members of the conspiracy, supports an inference that there was an agreement to distribute [methamphetamine], distinct from any underlying buy-sell relationship." *United States v. Villasenor*, 664 F.3d 673, 680 (7th Cir. 2011). Thus, the government's circumstantial evidence also tended to show that Bell was involved in the conspiracy.

"All that is necessary to establish a drug distribution conspiracy is an understanding related to the subsequent distribution of narcotics." *Avila*, 557 F.3d at 816. Based on the government's substantial direct and circumstantial evidence, we think such an understanding was obviously present here. Despite the arguments to the contrary, Bell was not merely an oblivious buyer in this methamphetamine-distribution conspiracy; he was an active participant in it.

*E. Neeley's Involvement in Jessie Jackson's Death*

Neeley also makes a sufficiency-of-the-evidence argument. Because the government sought to enhance Neeley's sentence because her distribution of methamphetamine caused Jessie's death, it had to prove that Neeley distributed methamphetamine to Jessie and that Jessie's consumption of that methamphetamine was a but-for cause of her death. *See*

*United States v. Burrage*, 134 S. Ct. 881, 887–91 (2014).[5] Neeley correctly concedes that some methamphetamine killed Jessie, but Neeley argues that the government's evidence was "woefully insufficient" to show that she supplied Jessie with that methamphetamine. (Appellants' Br. at 50.) Instead, she contends that Country Squire Lakes (the neighborhood where Jessie lived) was a "high crime area with a lot of methamphetamine activity" and that the methamphetamine that Jessie consumed on April 5, 2014 (the day she overdosed) could have come from a number of other sources in the neighborhood. (*Id.* at 48.)

As discussed above, Neeley faces an uphill battle in making this sufficiency-of-the-evidence challenge. *See, e.g.*, *Burns*, 843 F.3d at 684 (discussing the standard of review with sufficiency-of-the-evidence challenges). We need not repeat our standard of review here, but we stress again that Neeley's burden is "nearly insurmountable." *Id.*

Neeley's argument on appeal is riddled with speculation. The government's evidence at trial, on the other hand, was based in fact. The government presented witnesses who testified that Neeley was Jackson's regular (and possibly only) supplier of methamphetamine, that they had seen Neeley sell drugs to Jackson in the past, that Jackson had told them that Neeley provided the drugs that he and Jessie consumed on April 5, and that they had seen Neeley's car at Jackson's residence that morning. Moreover, the toxicology report re-

---

[5] This enhancement was also applied against Jackson. But because he does not raise a sufficiency-of-the-evidence claim associated with this enhancement, the analysis in this section is limited to Neeley's claim.

vealed that the methamphetamine that killed Jessie was extremely potent. Witnesses testified that Jackson had told them that he had purchased a potent dose of capsulated methamphetamine from Neeley on April 5 and that he and Jessie had consumed it shortly before Jessie began suffering from her fatal overdose.

Far from being "woefully insufficient," when we view this evidence (along with the rest of the government's evidence) in the light most favorable to the government, we think it's clear that Neeley supplied the methamphetamine that killed Jessie. Neeley's arguments to the contrary are unavailing.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgments of conviction regarding defendants-appellants Maggard, Bell, Jackson, and Neeley.