# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 20 2017, 9:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bradley K. Kage
North Vernon, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Katherine A. Cornelius
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.R.J., Sr., Father, and Ja.R.J. and Je.R.J., and Ju.J., Minor Children,

J.R.J., Sr.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 20, 2017

Court of Appeals Case No.
40A04-1706-JT-1276

Appeal from the
Jennings Circuit Court

The Honorable
Jon W. Webster, Judge

Trial Court Cause Nos.
40C01-1602-JT-1
40C01-1602-JT-2
40C01-1602-JT-3

**Kirsch, Judge.**

[1] J.R.J., Sr. ("Father") appeals the juvenile court's order terminating his parental rights to his three minor children. Father raises one issue on appeal that we restate as whether the juvenile court's judgment terminating his parental rights to the three children was clearly erroneous.

[2] We affirm.

## Facts and Procedural History

[3] For a period of time, Father and S.W. ("Mother") were married, and they had three children: a daughter ("Ja.J.") born in 2004; a son ("Je.J.") born in 2007; and another son ("Ju.J.") born in 2008 (collectively, "the Children"). In or around 2009, when Mother and Father were no longer living together, the Children began residing solely with Father, and in 2011 or 2012, he was awarded legal custody of them. Mother abused drugs and was only sporadically in the Children's lives. At some point, Father remarried, and the Children lived with Father and his wife ("Stepmother"), and Father was engaged in dealing drugs, including in the home and in the Children's presence.

[4] In early April 2014, Stepmother ingested methamphetamine that Father had given her. As a result of taking the drugs, Stepmother was hospitalized and died the next day. The Indiana Department of Child Services ("DCS") removed the Children from Father's home on April 10, 2014 on allegations of illegal drug use and domestic battery. On April 11, 2014, Father was arrested on federal criminal drug charges; he has been continuously incarcerated since

his arrest. After removal of the Children, DCS asked Mother and her live-in boyfriend to take drug tests before placing the Children with her, but Mother admitted that she would test positive for hydrocodone, and her boyfriend stated he would test positive for methamphetamine. DCS filed a child in need of services ("CHINS") petition for each of the Children, and the Children were placed with the Mother's sister, A.W. ("Maternal Aunt"). The Children remained with Maternal Aunt until September 2014, when she advised DCS that she could not keep the Children any longer, due to responsibilities caring for her ill father and her own children. DCS placed the Children together in foster care.

[5] After a fact-finding hearing on the CHINS petition, the juvenile court adjudicated the Children as CHINS in January 2015, and, in February 2015, it issued a dispositional order and parenting participation order. Father remained incarcerated, and Mother continued abusing drugs and failed to regularly participate in treatment. The initial permanency plan for the Children was reunification, but DCS asked the court to approve a concurrent permanency plan of termination of parental rights, and the court-appointed special advocate agreed with DCS's request for a concurrent plan of termination. In June 2015, the juvenile court changed the permanency plan to termination of parental rights. After a November 2015 CHINS permanency hearing, the juvenile court's order noted that Father remained in federal custody and it was "unknown . . . whether he has participated in the services ordered, if such were available in any of the facilities in which he has been held" and that Mother had

been released from incarceration in August 2015, had visited with the Children in September and October 2015, but had not restarted individual counseling and substance abuse treatment. *DCS Ex*. 1H. After a February 2016 CHINS review hearing, the juvenile court's order stated that the Children were currently placed in a foster home "with a very large extended family where the [C]hildren are provided opportunities to participate in family activities." *DCS Ex*. 1I. It also indicated that the Children were participating in extracurricular activities.

[6] In January 2016, Mother died. In March 2016, Father was found guilty after a federal jury trial of Conspiracy to Distribute 300 Grams or More of Methamphetamine (Causing Death) and Distribution of Methamphetamine (Causing Death). Father received two concurrent life sentences for the convictions.[1] On February 1, 2016, DCS filed a petition for termination of Father's parental rights. In August 2016, the Children's ex-step-grandfather, H.L.R., who had been married to the Children's maternal grandmother until they divorced in or around 2014, filed a petition for guardianship of the Children.

[7] The juvenile court held a consolidated hearing on the termination of parental rights petitions and the petition for guardianship. The hearing began on

---

[1] Father's appeal of his convictions and sentence was pending at the time of the termination hearing in February and April 2017; however, the Seventh Circuit Court of Appeals affirmed his convictions and sentence on August 4, 2017, before Father filed his Appellant's Brief on August 24, 2017. *United States v. Maggard*, 865 F.3d 960 (7th Cir. 2017).

February 17, 2017, and, due to time constraints, was concluded on April 11, 2017.[2] Father testified that after he was first incarcerated, and when the Children were with Maternal Aunt, he spoke to them a few times on the phone, but not since that time, and he had written to them a few times, but they had not responded. Father testified to completing various programs while incarcerated, including: Inside Out Dad; Challenge Program; and Balanced Family Lifestyle. He was also participating in anger management classes, and he had earned his G.E.D. Father recognized the trauma and difficulty that the Children had experienced in their lives, and he expressed that he was "not trying to block anything positive" for them and was "not trying to fight . . . my kids going to a permanent home." *Tr. Vol. II* at 14, 26. Father's preference would be that they be placed in guardianship with H.L.R. *Id.* at 35. He indicated that H.L.R. was a grandfather to them, has "always been a sense of security in their life," his home was "right down the street" from Father's, and that "[t]hey love him." *Id.* at 28, 35-36. Father explained that he did not want the Children to feel that he had abandoned them, and he wanted to be able to communicate with them, which H.L.R. had indicated Father could do if he were given guardianship of the Children.

[8] DCS family case manager Debra Scatterfield ("FCM Scatterfield") testified that she became involved in the case in May 2014, after the initial removal and

---

[2] We note that the juvenile court issued a separate order on the guardianship, denying H.L.R.'s petition, and he filed a notice of appeal with this court. This court will address the guardianship appeal by separate decision.

assessment, and was the family case manager on the case until August or September 2015, when family case manager Ryan Matern ("FCM Matern") took over the case, but FCM Scatterfield remained on the case as his supervisor. FCM Scatterfield described that Ja.J, the daughter and oldest of the three children, was very resilient, a good student, very "motherly" toward her two brothers, and "pretty stable" as of the date of the hearing. *Id.* at 44. FCM Scatterfield stated that Je.J. had "acting out" behaviors and issues with school, was diagnosed with ADHD, and after starting medications, had improved. *Id.* FCM Scatterfield said that the youngest, Ju.J., "has struggled the most." *Id.* He was diagnosed with ADHD and reactive attachment disorder ("RAD"). Following therapy, Je.J. and Ju.J. "saw vast improvement." *Id.* FCM Scatterfield testified that, after the Children left Maternal Aunt's home in September 2014, they went to a foster home and remained in that same home during the course of the proceedings. Once the case was transferred to FCM Matern, FCM Scatterfield did not see the Children again until Christmas Eve in December 2015, when she, along with the guardian ad litem and the foster mother, took the Children to the hospital to see Mother before she died. *Id.* at 45. FCM Scatterfield characterized it as "extremely traumatic" for the Children, but necessary "to say that final goodbye." *Id.* During her time as FCM on the case, Scatterfield arranged some visitations with Mother during 2015. She said that H.L.R. did not have any visitations with the Children during her time as FCM. *Id.* at 47.

[9]     FCM Matern, who assumed responsibility on the case in or around September 2015, also testified. He indicated that the Children were "doing well" in their current foster placement, where they had been for over two years. *Id*. at 73. He stated that the boys, Je.J. and Ju.J., had been having visits during weekends, generally for five hours or so, with H.L.R. for approximately a year, but that Ja.J. was not willing to participate in those visits. FCM Matern opined that termination, not the proposed guardianship, was in the Children's best interests because (1) Ja.J. does not want to visit with H.L.R., and (2) DCS had concern about having the Children return to the same area "where everything went down[,]" referring to the drug activity, arrest of their Father, and removal from his home. *Id.* at 72. DCS wanted the Children to have a "fresh start in a different place or with a new family." *Id*.

[10]    DCS also called as witnesses Sherry Moore ("Moore"), who was the Children's therapist at Life Springs, and Melanie Young ("Young"), who was the Children's case manager at Life Springs. Moore began seeing the Children in November 2014. When she first saw them, they had "[a] lot of trauma which presented with anger. They would shut down a lot. [Ja.J] especially was angry." *Id*. at 49. She elaborated:

> Their trauma was considered chronic because of the exposure to drugs, witnessing drug use, witnessing people in and out of the house, seeing you know drugs being sold, the death of their stepmother was another issue that they were dealing with, incarceration of their father, removal of the home, they had two placements — they were with their aunt, then they went into foster care[.]

*Id*. Moore also noted that their foster father died from cancer sometime in 2016. Moore testified that Ja.J. still experienced anxiety, worrying about what was going to happen to her and her brothers, and that because she was the caregiver for her brothers for so long, she struggled with being a sister and not a mother. Moore said that Ja.J. had indicated "on numerous occasions" that she wanted a home "with a mom and a dad," so that she could be a kid like others her age and not a mother. *Id*. at 55. The brothers had been diagnosed with ADHD and oppositional defiant disorder, which includes aggression and inability to regulate emotions. Moore stated that Je.J. internalizes everything and had made less progress because "he holds everything in." *Id*. at 51. Ju.J. also has RAD, caused by not having his needs met when he was younger, so he experienced difficulty getting along with people in social situations and had been hospitalized on four occasions due to outbursts and behavior issues. *Id*. at 52.

[11]    Moore said that H.L.R. had participated in some of the Children's therapy sessions, but that Ja.J. did not always want to be in the session if H.L.R. was there, and Ja.J. refused to go to his house for visits. Ja.J. expressed to Moore that returning to the same county, school, and area where she lived with Father would be "re-traumatizing to her all over again." *Id*. at 56. According to Moore, the Children rarely spoke about Father. Moore was aware of a possible adoptive family, consisting of a mother and father and children, and that the Children had told her that they "loved going over there" and "wish[ed] they could be adopted by that family." *Id*. at 58.

[12] Young explained that, in her job as a case manager at Life Springs, she helped to teach social skills and coping skills. She went to the Children's schools and also saw the Children outside of school hours in the community to work on social skills and getting along with others. She began working with Ju.J. in November 2014 and with Ja.J. and Je.J. in July 2015. Young taught skills and gave prompts to assist the Children not to get into physical and verbal altercations with peers and teachers. She said Ja.J. was doing well and that Je.J. was struggling, but had improved. Young shared that Ju.J. was "back to full days at school," as he had been only attending partial days due to disruptive behaviors in the classroom. *Id*. at 63. She testified, "They absolutely need to continue services," having made gains but needing continued reinforcement. *Id*.

[13] Although Young had not been present at any visits between the boys and H.L.R., she indicated that she had concerns about placing the Children with him due to the fact that there would not be a mother in the house, stating that both Ja.J., as well as the brothers, "need a strong female role model" in the house. *Id*. at 64. Moore was aware of a possible family that might be interesting in adopting the Children and that the Children had visited with the family.

[14] After DCS rested its case, H.L.R. and his former wife, who was the Children's maternal grandmother, K.R. ("Grandmother"), testified. H.L.R. was then fifty-one years old, lived alone at that time, and had no criminal convictions. For the year preceding the hearing, he had been having visits during most weekends

for five hours or so with the boys, Je.J. and Ju.J. His visits with Ja.J. "stopped a good while back," but he said he did not know why, stating, "I have no idea, she doesn't act like the same [Ja.J.]." *Id*. at 84, 89. He presented pictures of his home, bunk beds for the Children, and a van he purchased so that he could easily transport the Children. H.L.R. testified to attending the Children's activities and sporting events. He said that, if he were to be awarded guardianship, he would want the Children to stay in the same school that they were currently attending, that he would move his residence to that county, and that Grandmother would babysit them while he was at work.

[15]     Grandmother stated that she had gone to H.L.R.'s house on some occasions when he had the boys, to visit with them, and that Ja.J. came for a few visits, but then stopped coming. Grandmother did not know why Ja.J. did not want to go for visits at his home. When asked if she had any concerns with H.L.R. getting guardianship over the Children, she said "Yeah I do[,]" and said that sometimes there is yelling and arguing at his home, which sometimes is between her and H.L.R., but sometimes the boys get into it as well. *Id*. at 97-98. She opined, "[T]hey've been around enough of the yelling and arguing" and "I don't think they need to be associated with any of that." *Id*. at 99. Grandmother testified that in her opinion the Children "should stay together" and not be separated through any guardianship or adoption. *Id*. at 100, 102.

The juvenile court took the matter under advisement,[3] and on May 18, 2017, it issued its Order Terminating Parental Rights of Father ("Order"). The juvenile court's Order found that it was in the Children's best interests that the Father's parental rights be terminated, and it thereafter concluded, among other things:

> 4. There is a reasonable probability that the conditions that resulted in the minor [C]hildren's removal will not be remedied.

> 5. There is a reasonable probability that the reasons for placement outside the home of Father will not be remedied.

> 6. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the minor [C]hildren.

> 7. Termination of the parent child relationship is in the best interests of the minor [C]hildren.

> 8. DCS has a satisfactory plan for the care and treatment of the minor [C]hildren, which is adoption.

*Appellant's App. Vol. II* at 44. Father now appeals.

---

[3] At the conclusion of the evidence, the juvenile court indicated that it would be speaking to the Children *in camera* and was in the process of arranging a date and time to do so, when the guardian ad litem noted to the court that, in her opinion, it would not be in the boys' best interests to be interviewed by the court, due to maturity and other issues. The juvenile court thus arranged to meet only with Ja.J. *Tr. Vol. II* at 104. The record does not indicate whether the court did so.

# Discussion and Decision

[17] As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied.*

[18] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the

legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[19] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[20] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[21] Father argues that DCS failed to prove the required elements for termination by clear and convincing evidence and asserts that the juvenile court's judgment was clearly erroneous.[4] Specifically, he claims that DCS did not prove that (1) the conditions that resulted in the Children being removed or the reasons for their placement outside the home would not be remedied, (2) the continuation of the parent-child relationship posed a threat to the Children's well-being, (3) termination was in the Children's best interests, and (4) there was a satisfactory permanency plan in place for the Children.

---

[4] To the extent that Father claims that the juvenile court's Order did not actually terminate Father's rights, but instead merely contained findings leading to that conclusion, *Appellant's Br.* at 9, we reject that argument. The Order was entitled "Order Terminating Parental Rights of Father," and, further, the findings and conclusions outline why it was doing so. To find that the Order did not terminate Father's rights because it did not expressly state at the end the words that it was terminating Father's rights, would put form over substance.

### *Remediation of Conditions*

[22] In determining whether there is a reasonable probability that the conditions that led to a child's removal or the reasons for placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.,* 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.*

[23] In making the argument that DCS failed to establish that the conditions that led to the Children's removal or placement outside the home will not be remedied, Father does not suggest that the conditions have been or will be remedied. Rather, Father offers that he has, while incarcerated, availed himself of a variety of programs and services, had a good relationship with the Children before being incarcerated, and still hopes to continue to be "part of their lives."

*Appellant's Br.* at 13. We recognize Father's efforts at self-improvement while incarcerated and his wish to remain connected to the Children. However, the inquiry for us is to, first, examine what conditions led to the Children's placement and retention in foster care and, second, determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K.*, 989 N.E.2d at 1231.

[24] Here, the Children were removed on allegations of domestic battery and illegal drug use, after Father provided illegal and potent drugs to his then-wife, the Children's Stepmother, who was hospitalized as a result and died within days. Father was incarcerated, first in Kentucky, and then transferred to federal custody in another state, where he remained throughout the CHINS and termination proceedings. He was charged with federal drug crimes and convicted following a jury trial on two counts and sentenced to two life sentences, to run concurrently. The convictions and sentences were on appeal at the time of the termination hearing and, prior to this appeal, were affirmed. Mother died in January 2016, prior to the termination hearing. Although Father testified to completing services, and his willingness to continue to do so, this court has found, "[e]ven assuming that [father] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Indiana courts have recognized, "Individuals who pursue criminal activity run the risk of being denied the opportunity to develop

positive and meaningful relationships with their children." *K.T.K.*, 989 N.E.2d at 1235-36; *C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 585 (Ind. Ct. App. 2008), *trans. denied.* Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there was a reasonable probability that the conditions resulting in the Children's removal and continued placement outside Father's home would not be remedied.[5]

### Best Interests

[25] Father also argues that insufficient evidence was presented to prove that termination was in the best interests of the Children. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until a child is irreversibly harmed such that his or her

---

[5] Father also suggests DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the Children. We need not address the challenge to the juvenile court's conclusion that the continuation of the parent-child relationship posed a threat to the Children's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). Testimony of the service providers, such as recommendations of the case manager and guardian ad litem, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[26] The record before us reflects that the Children suffer from chronic trauma and, as result of all that they have been through, each suffers from psychological issues, including anxiety, PTSD, oppositional defiance disorder, and RAD. The Children were removed after their Stepmother consumed drugs provided by Father and died. Father was arrested and was never released. The Children were initially placed with Maternal Aunt until September 2014, when she could no longer care for them due to other family responsibilities, and they were then placed with a foster family, where they remained during the course of the proceedings. The Children exercised some visitations with their Mother during the proceedings, but her commitment to visitation was sporadic, and she relapsed into drug abuse and would disappear for periods of time. She was ill and hospitalized for several weeks in December 2015, and FCM Scatterfield, the foster mother, and the guardian ad litem took the Children to the hospital

for final goodbyes, and Mother died in January 2016. Later in 2016, the foster father died from cancer. In March 2016, Father was convicted after a jury trial of two federal drug offenses and sentenced to two concurrent life sentences. The Children attended therapy, weekly at first, with Moore, and she testified that the therapy must continue. Moore indicated that the Children rarely spoke of Father and that, while he had written to them and she provided the Children with the letters, the Children to her knowledge had not written back to Father, and Ja.J. sometimes left Father's letters at Moore's office rather than taking them with her.

[27] H.L.R. sometimes joined the Children at therapy sessions, but Ja.J. generally did not want to participate if he was present. Ja.J. told Moore that she desired an adoptive home with a mother and a father, and Moore had observed the Children with the foster family and stated that Ja.J. was "less parent-like" with the foster family. *Tr. Vol. II* at 56. Ja.J. told Moore that she did not want to return to the same neighborhood, area, and schools where they had lived with their Father, and where H.L.R. still lived, as this would re-traumatize her. Although the boys had had visitation with H.L.R. for some hours during most weekends over the year preceding the termination hearing, Ja.J. did not want to visit with him and did not go to his home. H.L.R. and Grandmother each stated that they did not know why Ja.J. felt this way and refused to go to H.L.R.'s house. Young, the Children's case manager at Life Springs, testified that she had concerns about placing the Children with H.L.R. due to the fact that Ja.J., as well as the brothers would be well served to have "a strong female

role model" in the house. *Tr. Vol. II* at 64. FCM Matern testified that he was aware of the pending guardianship, but believed termination of Father's parental rights was in the Children's best interests. *Id.* at 72.

[28] Based upon the totality of the evidence, we conclude that the evidence supported the juvenile court's determination that termination of Father's parental rights was in the Children's best interests.

### *Satisfactory Plan*

[29] Father also asserts that, while DCS had "explored adoption as a permanency plan," it had failed to establish that it has a satisfactory plan for the care and treatment of the Children. *Appellant's Br.* at 13. We have held that for a plan to be "satisfactory," for purposes of the statute, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Lang*, 861 N.E.2d at 374. A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. *Id.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *In re A.S.,* 17 N.E.3d at 1007.

[30] Here, FCM Matern testified that DCS's goals were to terminate Father's parental rights "and move forward with adoption." *Tr. Vol. II* at 72. He preferred adoption to the proposed guardianship with H.L.R., noting that Ja.J. did not want to visit with H.L.R., and he stated that DCS was "looking for . . . a fresh new start in a different place or with a new family." *Id.* Evidence was

presented that a possible adoptive family had been identified, and the Children had shared with their therapist, Moore, that they "loved going over there" and "wish[ed] they could be adopted by that family." *Id*. at 58. We conclude that the juvenile court did not err in determining that DCS had a satisfactory plan for the Children's care and treatment.

[31] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to the Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[32] Affirmed.

Najam, J., and Brown, J., concur