In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-3433

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANTHONY SANTIAGO,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cr-00383-1 — **Robert W. Gettleman**, *Judge*.

ARGUED APRIL 19, 2018 — DECIDED OCTOBER 2, 2018

Before RIPPLE, MANION, and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Anthony Santiago initially was charged with conspiracy to possess with intent to distribute 1000 grams or more of heroin and five or more kilograms of cocaine, in violation of 21 U.S.C. § 846, and with distribution of heroin, in violation of 21 U.S.C. § 841(a)(1). Superseding indictments also charged Mr. Santiago with several counts of money laundering, in violation of 18 U.S.C. § 1956.

Prior to trial, Mr. Santiago filed a motion to suppress phone recordings secured through a wiretap under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. The court denied that motion as well as a subsequent motion to reconsider. A jury later convicted Mr. Santiago on all charges that were tried. He now appeals the district court's ruling on the motion to suppress the Title III wiretap evidence. Specifically, he submits that the wiretap application incorrectly stated that the investigators did not know his identity and that the application failed to establish that the wiretap was necessary to obtain relevant evidence. If the district court had full and accurate information, he argues, it would not have issued the warrant. He further contends that, at the very least, he made a substantial preliminary showing that the application contained a deliberate or reckless misstatement of material fact that required a hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56. (1978).

Mr. Santiago's arguments are not persuasive. The warrant application's failure to identify Mr. Santiago by his name rather than simply by his nickname did not affect the issuing court's probable-cause analysis. The application also established that traditional investigative techniques had been employed, but were unlikely to uncover critical evidence about the targets. Finally, Mr. Santiago did not make the necessary showing to obtain a *Franks* hearing. We therefore affirm the judgment of the district court.

**I**

**BACKGROUND**

Sometime in 2011, the Government began investigating Pedro Salas for drug-related activity. The investigation included surveillance, use of confidential informants, as well as evidence procured through wiretaps. Specifically, on March 13, 2012, the Government received authorization to tap a phone identified as Target Phone 7, used by Salas, and, on April 6, 2012, received authorization to intercept communications on Target Phone 9, used by Sergio Baltazar-Lujano.[1] Through intercepted communications and surveillance, investigators were able to identify a participant by the nickname of "Titi," whom they believed to be involved in both narcotics trafficking and money laundering.

On April 11, 2012, Special Agent Kristofer White submitted an affidavit in support of an application for continuing the interception of communications of Target Phone 7 and for expanding the authorization to include an additional device, Target Phone 10. The application identified the following individuals as likely interceptees: Pedro Salas, aka "Tony" or "Bebe"; Sergio Baltazar-Lujano, aka "Primo" or "Gansito"; Gerardo Baltazar-Lujano, aka "Primo"; Jesus Fuentes, aka "Pepe"; unknown male UM7-5; FNU LNU[2] aka "Mantequita"; Pedro Trigo; and FNU LNU aka "Titi."[3] Titi was identified as the user of Target Phone 10. He, along with

---

[1] Mr. Santiago does not contest these wiretap authorizations.

[2] "FNU LNU" stands for first name unknown, last name unknown.

[3] *See* R.105-6 at 7.

the other interceptees, also were identified as "Violators," meaning that they had committed, were committing, and would continue to commit the offenses being investigated.[4]

The affidavit also alleged that there was probable cause to believe that the target phones were being used and would continue to be used by the Violators. Special Agent White believed that the intercepted communications would reveal: "the nature, extent, and methods of the distribution, transportation, storage and importation of controlled substances by the INTERCEPTEES and others"; "the nature, extent, and methods of operation of the illegal business being conducted by the INTERCEPTEES"; "the identities and roles of INTERCEPTEES, accomplices, aiders and abettors, co-conspirators, and other participants in these illegal activities"; "the distribution and transfer of controlled substances and money involved in the illegal activities"; "the existence and location of records related to the illegal activities"; "the location and source of resources used to finance the illegal activities"; "the location and disposition of the proceeds from the illegal activities"; and "the locations and items used in furtherance of the illegal activities."[5]

The affidavit recounted, as well, the evidence establishing probable cause to believe that the target phones were being used to coordinate illegal activities. Specific to Mr. Santiago, the affidavit included summaries of phone calls on April 3 and 4, 2012, between Salas on Target Phone 7 and Mr. Santiago on Target Phone 10. The first call concerned ar-

---

[4] *See id*. at 9.

[5] *Id*. at 10–11.

ranging a meeting with a Mexican contact who could help them obtain an import/export license to facilitate their narcotics business. The second call concerned a large shipment of narcotics from Mexico.[6]

Special Agent White also explained in his affidavit the need for the wire interception. Specifically, the agents were trying to

> (a) identify[] the individuals working with SALAS and others in distributing narcotics and collecting narcotics proceeds in the Chicago area; (b) identify[] customers of SALAS and the drug trafficking organization for which he works; (c) identify[] the source(s) of supply for SALAS; (d) identify[] the locations for storing narcotics and drug proceeds used by SALAS and (e) obtain[] admissible evidence necessary to prove beyond a reasonable doubt that the VIOLATORS, and others yet unknown, are engaged in the Subject Offenses.[7]

Moreover, in seeking this evidence, agents had employed traditional investigative techniques with some, but limited, success. For instance, visual surveillance of Salas and Titi on April 2–4, 2012, revealed that Salas had meetings with Titi, an individual known as "the doctor," and Sergio Baltazar-Lujano.[8] The agents were not privy to any of the discussions

---

[6] *See id*. at 64–65, 67.

[7] *Id*. at 72–73.

[8] *Id.* at 79–81.

because they were conducted inside. Moreover, Special Agent White described how, after leaving a meeting on April 3, Titi got into his Porsche and drove onto the expressway. There he changed speeds and lanes several times, and swerved over three lanes of traffic at high speed to exit at the last moment. Special Agent White stated that, in his experience, Titi was engaged in counter-surveillance to detect the presence of law enforcement.[9]

Although at least some members of the investigative team knew that Titi was Mr. Santiago,[10] that information was not included in Special Agent White's affidavit. Instead, Mr. Santiago was identified throughout the affidavit as FNU LNU aka "TITI."

Based on Special Agent White's affidavit, the district court entered an order authorizing the interception of wire communications on Target Phone 10 and extended the authorization on Target Phone 7. The Government later applied for and obtained a wiretap authorization for another phone used by Mr. Santiago (Target Phone 12) and two other phones used by Salas. This application tracked closely the April 11 application, but identified Mr. Santiago by his actual name. The affidavit in support of the application explained that

---

[9] *Id.* at 81.

[10] Special Agent Nick Loonan prepared a report of the April 2–4 surveillance on April 9, 2012. In the report, Special Agent Loonan noted that he "observed … Anthony SANTIAGO (aka TITI, per intercepted calls), who was driving the Porsche, enter the restaurant." R.105-1 at 2. Thus, as of April 9, 2012, at least Special Agent Loonan had identified Titi as Mr. Santiago.

> [i]n previous affidavits, SANTIAGO was only identified as "TITI." Law enforcement identified "TITI" as ANTHONY SANTIAGO in the following manner. During a recorded call over Target Phone 10 with SALAS on April 12, 2012 (Call #67), SANTIAGO recommended a lawyer in Tijuana, Mexico to SALAS and told SALAS to call the lawyer and say he was calling on behalf of "ANTHONY SANTIAGO." On a call the next day over Target Phone 10 (Call #68), an unknown male said to SANTIAGO, "Let me ask you this ANTHONY … ." When law enforcement obtained authority to intercept calls over Target Phone 10, the Court also ordered the telephone company to assist law enforcement in locating Target Phone 10 over the same 30-day period. Using that location information for Target Phone 10, law enforcement has conducted surveillance of SANTIAGO on a number of occasions in April 2012 and his appearance matches that of known photos of ANTHONY SANTIAGO.[11]

The application was granted.

Based in large part on evidence obtained through the wiretaps, Mr. Santiago was charged in a superseding indictment with conspiracy to distribute narcotics, distribution of narcotics, and money laundering. Prior to trial on these charges, Mr. Santiago moved to suppress the evidence ob-

---

[11] R.105-9 at 5 n.1 (emphasis removed).

tained from the April 11 wiretap authorization. In his motion, Mr. Santiago argued, among other grounds, that the Government had violated 18 U.S.C. § 2518(4)(a), which requires that the wiretap application include "the identity of the person, if known, whose communications are to be intercepted."[12] Mr. Santiago contended that the DEA knew of his identity prior to April 11, yet failed to identify him by his name in the affidavit. He also maintained that "normal investigative procedures were neither exhausted nor adequately attempted" prior to seeking the wiretap.[13] Finally, he submitted that the false statements and material omissions in the affidavit required a hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The district court denied the motion to suppress; it concluded that Mr. Santiago's challenge to the sufficiency of the wiretap affidavit was foreclosed by the Supreme Court's decision in *United States v. Donovan*, 429 U.S. 413 (1977).[14] Mr. Santiago moved for reconsideration,[15] and the court denied that motion as well.[16]

---

[12] R.105 at 15 (emphasis removed).

[13] *Id*. at 21.

[14] *See* R.156 at 7–8.

[15] *See* R.224.

[16] *See* R.279 (minute entry); R.416 at 4–5 (transcript of hearing in which district court denies motion). After the motion to reconsider was filed, the case was transferred to a new district judge. The new district judge denied the motion without prejudice to refile. *See* R.258. As trial approached, Mr. Santiago renewed his motion to suppress the wiretap evidence. *See* R.263. This motion was withdrawn, *see* R.275, and the new district judge ultimately ruled on the original motion to reconsider, *see* R.279.

Mr. Santiago proceeded to trial and was convicted on all three counts that were tried to the jury.[17]

## II

## DISCUSSION

### A.

On appeal,[18] Mr. Santiago renews his argument that the Title III wiretap evidence should have been suppressed because the Government did not meet the statutory requirements for obtaining the April 11, 2012 wiretap authorization. When reviewing the denial of a motion to suppress wiretap evidence, we review the district court's factual findings for clear error and its conclusions of law de novo. *See United States v. Fudge*, 325 F.3d 910, 917 (7th Cir. 2003).

Section 2518 of Title 18 sets forth the requirements for obtaining authorization for wiretaps. Among the information that must be included in a wiretap application is "a full and complete statement of the facts and circumstances relied upon by the applicant[] to justify his belief that an order should be issued[.]" 18 U.S.C. § 2518(1)(b). The statement is "full and complete" if it includes

> (i) details as to the particular offense that has
> been, is being, or is about to be committed, (ii)

---

[17] The jurisdiction of the district court is predicated on 18 U.S.C. § 3231. The counts tried to the jury included one violation of 21 U.S.C. § 846, one violation of 21 U.S.C. § 841(a)(1), and one violation of 18 U.S.C. § 1956. The district court severed and later dismissed the remaining counts.

[18] Our jurisdiction is predicated on 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted[.]

*Id*. The application also must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" *Id*. § 2518(1)(c).

Once an application is filed, the court may enter the order authorizing the wiretap if it determines that the Government has satisfied the requirements of the statute. Specifically, the district court must determine that

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).

Finally, § 2518(10)(a) provides an avenue for an "aggrieved person" to challenge evidence obtained through an authorized wiretap. Specifically, an aggrieved person may move to suppress

the contents of any wire … communication … on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval.

*Id.* § 2518(10)(a).

**B**.

Mr. Santiago maintains that the evidence gathered through the April 11 authorization should be suppressed because Special Agent White failed to identify him by name as required by § 2518(1)(b)(iv), even though his name was known at the time the affidavit was submitted to the court. *United States v. Donovan*, 429 U.S. 413 (1977), forecloses this argument.

In *Donovan*, the Government had secured authorization for an initial wiretap of three named individuals and three "others, as yet unknown." *Id*. at 418. Through recorded conversations, the Government learned that the names of the three unknown individuals were Donovan, Robbins, and Buzzacco. The Government then applied for an extension of the wiretap. In its extension application, the Government failed to identify Donovan, Robbins, and Buzzacco by name and failed to state that their conversations would be intercepted. After Donovan, Robbins, and Buzzacco were indicted, they moved to suppress the wiretap evidence on the ground that the failure to identify them by name in the extension application violated 18 U.S.C. § 2518(1)(b)(iv). The district court granted the motion to suppress, and the court of appeals affirmed.

The Supreme Court, however, reversed. It held that, although there was a violation of the identification provision, the evidence should not have been suppressed. With respect to the identification, the court rejected the Government's argument that the statute only required identification of the "principal" target of the investigation—the one whose phone was to be monitored. *Donovan*, 429 U.S. at 423. The Court held that the statutory language—"the person, if known, committing the offense and whose communications are to be intercepted"—"is as applicable to a suspect placing calls to the target telephone as it is to a suspect placing calls from the telephone." *Id*. at 424–25 (internal quotation marks omitted). Therefore, "a wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *Id*. at 428. The Court

concluded that the statute made no distinction between "principal target[s]" and other suspects whose communications were to be intercepted. *See id*. at 425–28.

Turning to the issue of suppression, the Court noted that "[t]here [wa]s no basis on the facts of this case to suggest that the authorization orders [we]re facially insufficient, or that the interception was not conducted in conformity with the orders." *Id*. at 432 (referencing § 2518(10)(a)(i) and (ii)). Consequently, the only question was whether the communications were unlawfully intercepted. In answering this question, the Court turned to its earlier cases, *United States v. Giordano*, 416 U.S. 505 (1974), and *United States v. Chavez*, 416 U.S. 562 (1974). Those cases had held that not every failure to comply fully with a Title III requirement renders the interceptions "unlawful." *Donovan*, 429 U.S. at 433 (quoting *Chavez*, 416 F.3d at 575). Instead, "suppression is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" *Id*. at 433–34 (quoting *Giordano*, 416 U.S. at 527). The failure to identify some of the individuals likely to be intercepted, the Court held, does not fall into this category. The Court explained that the statute allowed a judge to

> approve an intercept application if he determines that normal investigative techniques have failed or are unlikely to succeed and there is probable cause to believe that: (i) an individual is engaged in criminal activity; (ii) particular communications concerning the offense will

be obtained through interception; and (iii) the target facilities are being used in connection with the specified criminal activity. That determination is based on the "full and complete statement" of relevant facts supplied by law enforcement authorities. If, after evaluating the statutorily enumerated factors in light of the information contained in the application, the judge concludes that the wiretap order should issue, the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization. The intercept order may issue only if the issuing judge determines that the statutory factors are present, *and the failure to name additional targets in no way detracts from the sufficiency of those factors*.

*Donovan*, 429 U.S. at 435 (emphasis added) (citation omitted). "Here," the Court reasoned, "the statutorily imposed preconditions to judicial authorization were satisfied," but the issuing judge simply was not aware that other persons might be heard engaging in incriminating conversations. *Id*. at 436. The Court concluded that "[i]n no meaningful sense can it be said that the presence of that information as to additional targets would have precluded judicial authorization of the intercept." *Id*. Consequently, the Court reversed the suppression order.[19]

---

[19] The Court did leave open the possibility that suppression may be available as a remedy if the defendant could establish bad faith on the

(continued … )

The facts in Mr. Santiago's case are strikingly similar to those in *Donovan*. Here, as in *Donovan*, the Government had received initial authorization to tap the phone of Salas. By early April, at least one member of the DEA investigative team had identified Titi as Mr. Santiago. However, the April 11 application for extension and expansion of the wiretap authorization failed to identify Mr. Santiago by his name; it only identified him as Titi. We need not consider whether this constitutes a violation of the identification requirement because, even if it is, suppression is not warranted. The affidavit sets out in great detail that Salas, "Titi," and others were engaged in criminal activity, that particular communications concerning the offense would be obtained through interception; and that Target Phones 7 and 10 were being used in connection with the criminal activity. Thus, there was evidence that all of the statutory factors had been met; the failure to identify all of the suspects by their legal names did not detract from the sufficiency of those factors.

Mr. Santiago contends, however, that his case is not governed by *Donovan*. First, he claims that he was a "principal target" of the wiretap; consequently, the failure to name him impinges on a "requirement[] that directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Donovan*, 429 U.S. at 433–34 (quoting *Giordano*, 416 U.S. at 527). However, in *Donovan*, the Supreme Court explicitly re-

---

( … continued)

part of the Government or if the defendant could show prejudice resulting from his failure to be named. *See id*. at 439 n.26; *see also infra* at 16–18.

jected the idea that there are different levels of priority among targets. Instead, the statute treats all anticipated interceptees the same. *See id*. at 424–28 (discussing and rejecting the argument that identification requirement is limited to principal targets).

Second, Mr. Santiago states that his case differs from *Donovan* because he has demonstrated bad faith on the part of the Government. In *Donovan*, the Court noted that there was "no suggestion … that the Government agents knowingly failed to identify respondents Donovan, Robbins, and Buzzacco for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking." *Id.* at 436 n.23; *see also United States v. Matthews*, 213 F.3d 966, 969 (7th Cir. 2000) (noting that *Donovan* had held "that suppression of the evidence is not necessarily the appropriate remedy for a violation of Title III unless the defendant demonstrates either 1) bad faith on the part of the government; or 2) prejudice"). Mr. Santiago maintains that "[b]ad faith is apparent" because the Government "explicitly and falsely stated his identity was unknown."[20] According to Mr. Santiago,

> [t]here is a colorable reason to believe that Agent White [the author of the affidavit] knew of Santiago's identity prior to April 11, and either did not want to rewrite the affidavit, or did not want to engage in the due diligence to establish the degree of exhaustion that the

---

[20] Appellant's Br. 30.

judge may have required if Santiago's identity
were known.[21]

At bottom, Mr. Santiago is arguing that the failure to
identify him by name in the April 11 affidavit, without more,
raises the specter of bad faith. However, *Donovan* disposes of
this argument. In *Donovan*, it was undisputed that all three
targets, Donovan, Robbins, and Buzzacco, were "known" to
the Government at the time it sought the wiretap extension.
*Id*. at 419 n.5. This knowledge, however, did not "sug-
gest[] … that the Government agents knowingly failed to
identify" the targets for the purpose of keeping information
from the district court. *Id*. at 436 n.23. Here, there is no evi-
dence that Special Agent White's failure to include Mr. San-
tiago's name in the affidavit was anything other than a mere
oversight. Moreover, the Government obtained no ad-
vantage by omitting Mr. Santiago's identity. Indeed, in the
very next wiretap application, Special Agent White identi-
fied Titi as Mr. Santiago and explained how the Government
had confirmed his identity.[22] This later application also was
granted.[23]

---

[21] *Id*.

[22] *See* R.105-9 at 5 n.1.

[23] Mr. Santiago also maintains that he has suffered prejudice as a result
of Special Agent White's failure to identify him in the affidavit. Mr. San-
tiago notes that Special Agent White listed the inability "to fully identi-
fy … Titi" as one of the reasons why the wiretap was needed. *See* R.105-6
at 74. Mr. Santiago submits that, if the district court had been apprised
that his identity was known, it would have determined that there was no
need for the wiretap and would not have authorized it. Because his ar-

(continued … )

## C.

Mr. Santiago also maintains that the Government failed to establish necessity for the April 11 wiretap. In determining whether a Title III warrant establishes necessity, we generally review the issuing court's order for an abuse of discretion. *See United States v. Maggard*, 865 F.3d 960, 967 (7th Cir. 2017).[24]

---

( … continued)

gument regarding prejudice is the same as his argument regarding necessity, we address it in our discussion of necessity. *See infra* at 19–24.

Mr. Santiago submits in the alternative that the wiretap evidence should have been suppressed even in the absence of a showing of bad faith or prejudice. He notes that in *United States v. Giordano*, 416 U.S. 505 (1974), the Court did not require a showing of bad faith before it suppressed evidence from a wiretap application that had originated with the Attorney General's Executive Assistant, as opposed to "the Attorney General" or an "Assistant Attorney General specially designated by the Attorney General" as required by 18 U.S.C. § 2516(1). In *Giordano*, however, the Court explained that "the provision for pre-application approval was intended to play a central role in the statutory scheme and the suppression must follow when it is shown that this statutory requirement has been ignored." *Id*. at 528. The Court in *Donovan* distinguished the situation before it—the affidavit failing to identify specifically three known interceptees—with the situation in *Giordano*, "where the failure to satisfy the statutory requirement of prior approval by specified Justice Department officials bypassed a congressionally imposed limitation on the use of the intercept procedure." *Id*. at 435. Here, as in *Donovan*, the agents seeking the application did not ignore a critical step in the approval process; instead, Special Agent White's affidavit simply failed to identify one of several interceptees. Therefore, *Donovan*, not *Giordano*, dictates the circumstances under which suppression is warranted.

[24] Mr. Santiago maintains that deference is not warranted when the "affidavit in question contain[s] several factual errors and omissions that

(continued … )

( … continued)

prevent[] the issuing judge from making a fully informed decision." Appellant's Br. 15. Mr. Santiago relies on *United States v. Glover*, 755 F.3d 811, 817 (7th Cir. 2014), and *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007), in support of his contention. In *Glover*, the defendant challenged a search warrant on the ground that it was not supported by probable cause. The affidavit in support of the warrant relied almost entirely on the statement of a confidential informant, but critical information about the informant's credibility had been left out of the affidavit, namely: "his criminal record[] … ; his gang activity; his prior use of aliases to deceive police; and his expectation of payment." *Glover*, 755 F.3d at 817. The Government conceded that "such information [wa]s so essential to a witness's credibility that the same information regarding a government witness at trial would have [had] to [have] be[en] disclosed to the defense as exculpatory material under *Brady v. Maryland*." *Id*. We concluded that "the omissions from the affidavit deprived the magistrate of highly relevant information that tends to undermine Doe's credibility and thus the probable cause determination." *Id*. at 817–18. Here, however, nothing about the omission of Mr. Santiago's full identity called into question the credibility of Special Agent White or the substance of the remaining sections of the affidavit.

The facts here also bear little resemblance to those in *Rice*. In *Rice*, the affidavit submitted in support of the wiretap authorization had represented that "[p]hysical surveillance of the subjects of this investigation has been conducted and is presently being conducted with only limited success." 478 F.3d at 707 (alteration in original). It also stated that surveillance posed an unreasonable danger to law enforcement because members of the organization carried firearms. However, testimony at the suppression hearing revealed that agents never had conducted surveillance of Rice and had no specific information that he carried a firearm. There were similar misstatements with respect to other areas of investigation. *See id*. at 708–09. The district court found that the misleading statements were made recklessly, and given this misleading information, the issuing judge's determination of necessity did not warrant the usual deference. *See id*. at 709. Again, here there is no evidence that materially misleading statements infected the entire affidavit in support of the wire-

(continued … )

Under 18 U.S.C. § 2518(1)(c), an affidavit submitted in support of a wiretap must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Although commonly referred to as the "exhaustion or necessity requirement," *United States v. Campos*, 541 F.3d 735, 746 (7th Cir. 2008), our case law makes clear that "[t]his section of the statute was *not* intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation." *United States v. McLee*, 436 F.3d 751, 762–63 (7th Cir. 2006) (internal quotation marks omitted). Indeed, in *McLee* we explained:

> The rule in this circuit is that the government's burden of establishing compliance with § 2518(1)(c) "is not great," and that the requirement of exhausting "other investigative procedures" prior to obtaining a wiretap is "reviewed in a practical and common-sense fashion." To receive a wiretap order, the government need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means. We have upheld the "necessity" of

---

( … continued)

tap application. Because the missing information does not taint the remainder of the affidavit, there is no reason for us to abandon our usual, deferential approach.

> wiretap orders on the basis that investigators were "having trouble fingering other members of the conspiracy," and that the wiretaps "allowed the government to ascertain the extent and structure of the conspiracy."

436 F.3d at 763 (citations omitted).

Mr. Santiago maintains that necessity has not been shown because the stated reason for the wiretap was "identifying the individuals working with SALAS and others in distributing narcotics and collecting narcotics proceeds in the Chicago area."[25] Because his identity was known, he concludes, there was no necessity for the wiretap.

We cannot accept Mr. Santiago's characterization of the reason for the wiretap. In addition to identifying Salas's confederates, Special Agent White's affidavit identified four other goals of the investigation for which a wiretap was "the only available technique that ha[d] a reasonable likelihood" of success:

> (b) identifying customers of SALAS and the drug trafficking organization for which he works; (c) identifying the source(s) of supply for SALAS; (d) identifying the locations for storing narcotics and drug proceeds used by SALAS; and (e) obtaining admissible evidence necessary to prove beyond a reasonable doubt

---

[25] R.105-6 at 72–73.

> that the VIOLATORS, and others yet un-
> known, are engaged in the Subject Offenses.[26]

The fact that Mr. Santiago's identity was known only diminishes the need for one category of evidence identified by Special Agent White: the identity of those working with or for Salas. Even with respect to this category, however, it is undisputed that there were several individuals involved in the transactions, such as UM7-5 and Mantequita, whom the Government had not identified.[27] Consequently, even if Special Agent White's affidavit had identified Titi as Mr. Santiago, there still would have been the need for the wiretap to collect evidence as to the identities of other individuals.

Mr. Santiago also argues that the Government did not establish that traditional investigative methods had been tried or would be unsuccessful in the investigation of *his* activities, as opposed to those of other members of the conspiracy. The affidavit, however, contains evidence specific to Mr. Santiago that shows the April 11 wiretap was not the first step in the Government's investigation. The affidavit describes two days of surveillance of Mr. Santiago. During this time, Mr. Santiago engaged in a series of meetings with Salas and his associates; all of these meetings occurred behind closed doors, out of earshot and view of the surveilling agents. After leaving one of these meetings, Mr. Santiago got on the expressway. Once on the expressway, he

---

[26] *Id*.

[27] *See id*. at 8.

> got into the left hand lane and drove substan-
> tially over the speed limit, and then moved in-
> to another lane and slowed down to approxi-
> mately the speed limit, and then repeated the
> process numerous times. … When
> [Mr. Santiago] got off the expressway, he
> swerved over three lanes of traffic at a high
> rate of speed to exit at the last second. Once off
> the expressway, [Mr. Santiago] swerved in and
> out of traffic several times in an effort to de-
> termine if he was being followed.[28]

Special Agent White explained that, based on his training
and experience, he believed that these actions were efforts
by Mr. Santiago to engage in counter-surveillance tactics.[29]
Thus, the affidavit contained evidence that the investigating
agents employed traditional techniques in investigating Mr.
Santiago, but that, given the counter-surveillance efforts,
those techniques had not been, and were not likely to be,
successful in garnering evidence. This declaration satisfied
the Government's burden.

### D.

Our discussion of bad faith and necessity also disposes of
Mr. Santiago's claim that the district court should have or-

---

[28] R.105-6 at 81.

[29] *See id*. Contrary to Mr. Santiago's assertions, the detailed description of
the agents' surveillance efforts, and their first-hand observations of
Mr. Santiago's counter-surveillance tactics, are not merely "generalized
and conclusory statements that other investigative procedures would
prove unsuccessful." *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983).

dered an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that "a wiretap order is invalid … if the order was obtained by the government's deliberate or reckless omission of material information from its application." *United States v. Mandell*, 833 F.3d 816, 823 (7th Cir 2016). A defendant is entitled to an evidentiary hearing on the validity of the authorization if he "makes a substantial preliminary showing," *id*. (internal quotation marks omitted), which we have described as "relatively difficult":

> Allegations of negligent or innocent mistakes do not entitle a defendant to a hearing, nor do conclusory allegations of deliberately or recklessly false information. The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses. To obtain a hearing, the defendant must also show that if the deliberately or recklessly false statements were omitted, or if the deliberately or recklessly misleading omissions included, probable cause would have been absent.

*United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013) (citations omitted). "[I]f probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008). We review the district court's denial of a *Franks* hearing for clear error. *Mandell*, 833 F.3d at 823.

As we already have discussed, there is no evidence in the record that Special Agent White's failure to identify Titi as Mr. Santiago was anything other than an oversight.[30] Moreover, the inclusion of Mr. Santiago's name would not have altered the district court's conclusion that there was probable cause to believe that Target Phones 7 and 10 were being used to conduct illegal transactions. The affidavit is replete with evidence that the target phones were used to coordinate drug transactions, that the transactions were on-going, and that the tapping of those phones would lead to further evidence of criminal activity.

Indeed, Mr. Santiago's argument is not based on probable cause, but on necessity. He claims that, if he had been identified, the remaining allegations of the affidavit would not have satisfied the necessity requirement of the wiretap statute. Although a number of our sister circuits have applied the *Franks* analysis to the necessity requirement, *see, e.g.*, *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999); *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985), we have not had an occasion to address directly this issue and need not address it here. Even assuming that *Franks* applies to the necessity requirement, a hearing would not have been required here.

As we have explained previously, the Government's burden with respect to showing necessity is not great. "We have upheld the 'necessity' of wiretap orders on the basis that investigators were 'having trouble fingering other members of the conspiracy,' and that the wiretaps 'allowed

---

[30] *See supra* at 18.

the government to ascertain the extent and structure of the conspiracy.'" *McLee*, 436 F.3d at 763 (citations omitted). Here, the affidavit explained that there was a need for interception to understand Salas and his organization, including his customers, his sources, and the location of storage facilities. Knowledge of Mr. Santiago's true identity does not diminish the necessity of the wiretap vis-à-vis these stated goals.

Moreover, wiretaps need not be "a last resort in an investigation, but rather … are 'not to be routinely employed as the initial step' in a criminal investigation." *Id*. (quoting *United States v. Thompson*, 944 F.2d 1331, 1340 (1991)). Here, Special Agent White's affidavit establishes that agents attempted surveillance of Mr. Santiago, but their efforts to collect information were thwarted by counter-surveillance techniques.

Mr. Santiago simply has not made a substantial preliminary showing that, if his identity had been included in the affidavit, necessity would have been lacking. Therefore a *Franks* hearing was not warranted.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED